**SCOTT E. BRADFORD, OSB #062824**
United States Attorney
District of Oregon
**JAMES A. BLUM, OSB #257369**
**TSECHU DOLMA, WSBA #64665**
Assistant United States Attorneys
james.blum@usdoj.gov
tsechu.dolma@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2936
Phone: (503) 727-1000
Attorneys for Defendant

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| NAPHTALI RENSHAW; SUSAN BARNHART; TYRRAS WARREN; MICHAEL CARRIGAN; CHRISTOPER ROMPALA; and CHARLES AREFORD, | Case No. 6:26-cv-01127-MTK |
| Plaintiffs, | DEFENDANT GSA'S RESPONSE TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |
| v. | |
| GENERAL SERVICES ADMINISTRATION, | |
| Defendant. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

RESPONSE ................................................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

    I.    STATEMENT OF THE CASE .................................................................................. 1

        A.  Factual Background ...................................................................................... 1

        B.  Procedural Background ................................................................................. 4

    II.    LEGAL STANDARD ............................................................................................... 5

        A.  Preliminary Injunction ................................................................................. 5

            i.     *The* Winter *Test* ............................................................................ 5

            ii.    *Preliminary Injunctions in the First Amendment Context* ......... 6

           iii.   *Prohibitory Injunctions Versus Mandatory Injunctions* ............. 8

        B.  The Administrative Procedure Act ............................................................. 8

            i.     *5 U.S.C. § 706(2)(A)* ................................................................... 9

            ii.    *5 U.S.C. § 706(2)(B)* ................................................................... 9

           iii.   *5 U.S.C. § 706(2)(C)* ................................................................... 9

           iv.   *5 U.S.C. § 706(2)(D)* ................................................................. 10

    III.   LEGAL ARGUMENT ............................................................................................ 11

        A.  Plaintiffs have not demonstrated they are likely to succeed on the merits of their APA claims .............................................................................. 11

            i.     *5 U.S.C. § 706(2)(A): Arbitrary and Capricious* ..................... 11

            ii.    *5 U.S.C. § 706(2)(B): Contrary to Constitutional Right* ......... 13

           iii.   *5 U.S.C. § 706(2)(C): In Excess of Legal Authority* ............... 15

           iv.   *5 U.S.C. § 706(2)(D): Failure to Follow Procedures* ............. 18

B.  Plaintiffs have not satisfied the remaining three factors of the *Winter* test........... 19

CONCLUSION................................................................................................................... 22

**Page ii**          **Response to Plaintiff's Motion for a Preliminary Injunction**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ................................................................. 6, 20
*Am. Beverage Ass'n v. City & Cnty. of San Francisco,*
  916 F.3d 749 (9th Cir. 2019) ................................................................... 6, 20
*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) .................................................................. 5, 19
*Bennet v. Spear,*
  520 U.S. 154 (1997)......................................................................................... 9
*Berger v. City of Seattle,*
  569 F.3d 1029 (9th Cir. 2009) ................................................................. 7, 14
*Boyer v. City of Simi Valley,*
  978 F.3d 618 (9th Cir. 2020) ........................................................................ 7
*Cal. Chamber of Commerce v. Council for Educ. Research on Toxics,*
  29 F.4th 468 (9th Cir. 2022) .......................................................................... 7
*Carmenzind v. Cal. Exposition & State Fair,*
  84 F.4th 1102 (9th Cir. 2023) .................................................................. 8, 14
*Chamberless Enterprises v. Redfield,*
  508 F. Supp. 3d 101 (W.D. La. 2020)..................................................... 18, 19
*China Unicom (Ams.) Operations, Ltd. v FCC,*
  124 F.4th 1128 (9th Cir. 2024) .................................................................... 10
*Clark v. Community for Creative Non-Violence,*
  468 U.S. 288 (1984).......................................................................................... 8
*Clark v. Weber,*
  557 F. Supp. 1010 (C.D. Cal. 2021) .............................................................. 8
*Coalition to Protest the Democratic National Convention v. City of Boston,*
  327 F. Supp.2d 61 (D. Mass. 2004) ........................................................ 14, 15
*Doe v. Harris,*
  772 F.3d 563 (9th Cir. 2014) ........................................................................ 6
*Doe v. San Diego Unified Sch. Dist.,*
  14 F.4th 1173 (9th Cir. 2021) ....................................................................... 6
*Edge v. City of Everett,*
  929 F.3d 657 (9th Cir. 2019) ........................................................................ 5
*Ferreira v. Mayorkas,*
  767 F. Supp. 3d 929 (N.D. Cal. 2025) ......................................................... 10
*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ........................................................................ 8
*George v. United States,*
  901 F. Supp. 2d 1179 (N.D. Cal. 2012) ......................................................... 9
*Hells Canyon Pres. Council v. U.S. Forest Serv.,*
  593 F.3d 923 (9th Cir. 2010) ........................................................................ 9

*Kalispel Tribe of Indians v. DOI*,
  999 F.3d 683 (9th Cir. 2021) ................................................................... 10, 16, 17
*Kern Cnty. Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) ..................................................................... 10
*Lone Star Sec. & Video, Inc. v. City of Los Angeles*,
  827 F.3d 1192 (9th Cir. 2016) ....................................................................... 7
*Loper Bright Enter. v. Raimondo*,
  603 U.S. 369 (2024)......................................................................................... 8
*Marlyn Nutraceuticals, Inc. v. Mucos Pharm. GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) .......................................................................... 8
*McCullen v. Coakley*,
  573 U.S. 464 (2014).................................................................................... 8, 14
*Meinecke v. City of Seattle*,
  99 F.4th 514 (9th Cir. 2024) ....................................................................... 6, 7
*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ..................................................................... 6, 20
*Motor Vehicle Ass'n v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983).................................................................................. 9, 11, 12
*N.D. v. Reykdal*,
  102 F.4th 982 (9th Cir. 2024) ........................................................................ 8
*Newport Fishermen's Wives, Inc. v. United States Coast Guard*,
  813 F. Supp. 3d 1209 (D. Or. 2025) ............................................................... 6
*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................................... 6, 20
*Occupy Eugene v. GSA*,
  43 F. Supp. 3d 1143 (D. Or. 2014) ............................................................... 13
*Porretti v. Dzurenda*,
  11 F.4th 1037 (9th Cir. 2021) ......................................................................... 6
*Recycle for Change v. City of Oakland*,
  856 F.3d 666 (9th Cir. 2017) ...................................................................... 7, 13
*Reed v. Town of Gilbert*,
  587 F.3d 966 (9th Cir. 2009) ...................................................................... 8, 14
*Servicios, Inc. v. Fin. Crimes Enforcement Network*,
  785 F. Supp. 3d 785 (S.D. Cal. 2025)........................................................... 10
*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994) ...................................................................... 8, 19
*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024).......................................................................................... 5
*Stenson Tamaddon, LLC v. IRS*,
  742 F. Supp. 3d 966 (D. Ariz. 2025) ............................................................ 10
*Tyler v. Coeur d'Alene School Dist.*,
  568 F. Supp. 3d 1071 (D. Idaho 2021) ..................................................... 20, 21
*Vivid Entm't, LLC v. Fielding*,
  774 F.3d 566 (9th Cir. 2014) ...................................................................... 19, 20
*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)........................................................................................... 7

**Page iv       Response to Plaintiff's Motion for a Preliminary Injunction**

*Winter v. NRDC,*
  555 U.S. 7 (2008) ......................................................................................................... 1, 5
*Yong v. Reg'l Manpower Admin.,*
  509 F.2d 243 (9th Cir. 1975) ........................................................................................ 10

**Statutes**

5 U.S.C. § 551 ................................................................................................................. 18, 19
5 U.S.C. § 553 ................................................................................................................. 18, 19
5 U.S.C. § 706 ................................................................................................................. *passim*
40 U.S.C. § 3306 ............................................................................................................. 15, 16
42 U.S.C. §§ 4151-57 ..................................................................................................... 15, 16, 17

**Rules**

Fed. R. Civ. P. 65 ................................................................................................................. 5

**Regulations**

36 C.F.R. § 1191 ................................................................................................................. 17

## RESPONSE

Defendant General Services Administration (GSA) submits this Response to Plaintiffs Naphtali Renshaw's, Susan Barnhart's, Tyrras Warren's, Michael Carrigan's, Christopher Rompala's, and Charles Areford's Motion for Preliminary Injunction. This Response is supported by the following Memorandum of Points and Authorities.

The Court should deny Plaintiffs' Motion for a Preliminary Injunction. Plaintiffs fail to satisfy their burden for a preliminary injunction under the four-factor test from *Winter v. NRDC*, 555 U.S. 7 (2008). Crucially, they have not shown they are likely to prevail on the merits of their Administrative Procedure Act (APA) claims. The record demonstrates that Defendant's decision to erect a security fence on federal property in Eugene, Oregon was rational, procedurally sound, legally permitted, and a reasonable time, place, or manner restriction. The Court should deny Plaintiffs' Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF THE CASE

A.  <u>Factual Background</u>

In 2025, the Eugene Federal Building (Federal Building) experienced increased protest activity. Anderson Decl., Exhibit A, ¶ 2. Several security incidents occurred during and after September 2025. Turner  Decl., Exhibit B, ¶¶ 7. For example, on September 23, 2025, a group of protestors "banged on windows in an attempt to forcefully enter the building and tampered with the gate card reader and Aiphone Intercom system." *Id.* . One of those individuals was "arrested and cited for attempted assault on a federal officer after throwing a 4-foot metal sign." *Id.*

By January 2026, security incidents around the Federal Building had escalated. Exhibit A, ¶ 3; Exhibit B, ¶ 9. Individuals had begun to "confront[] members of the public who were

**Page 1        Response to Plaintiff's Motion for a Preliminary Injunction**

attempting to access service within the [Federal Building], as well as employees assigned to the Facility." Exhibit A, ¶ 3. The Veterans Health Administration (VHA) reported that "veterans coming to the facility were being adversely affected by the protest activity," such as those with "post-traumatic stress disorder report[ing] being severely triggered by interactions with aggressive protestors." *Id.* ¶ 5. Given these conditions, "VHA determined that it could no longer safely and reliably meet its mission" at the Federal Building. *Id.* ¶ 6.

The Federal Building's Facility Security Committee (FSC) had begun considering security measures to "deter aggressive protestors from interfering with agency missions, accessing the courtyard, and disrupting [] operations." *Id.* ¶ 4. Federal Protective Services (FPS)—which is the primary law enforcement agency responsible for security at the Federal Building—and Defendant jointly recommended a security fence. Exhibit B, ¶¶ 3, 8. FPS suggested a security fence surrounding "the upper plaza, lobby, and VA annex, where significant property damage, assaults on federal officers, and disorderly conduct occurred," while suggesting "the lower plaza remain open." *Id.* ¶ 8. By January 23, 2026, a majority of the FSC approved the installation of a security fence "and directed GSA to acquire [one] similar to the fencing used at the Hatfield Courthouse during prior civil unrest." Exhibit A, ¶ 7. On January 29, 2026, the Public Building Service (PBS), a division of GSA, submitted a project request to initiate the construction of a security fence. Exhibit A, ¶ 9.

On January 30, 2026, the Eugene Police Department (EPD) declared a riot outside the Eugene Federal Building. *Id.* ¶¶ 10-12. A crowd of approximately 400 people "began banging on the glass windows." Exhibit B, ¶ 9. The incident resulted in the evacuation of the Federal Building. Exhibit A, ¶ 10. Eventually, protestors breached the main lobby and broke large windows. *Id.* ¶ 11; Exhibit B, ¶¶ 9-10. The EPD and FPS eventually cleared protestors off the property. Exhibit

**Page 2        Response to Plaintiff's Motion for a Preliminary Injunction**

A, ¶ 12;. A few days later, a rock was thrown through the second-floor window of the office of an administrative law judge employed by the Social Security Administration (SSA). Exhibit A, ¶ 19.

As a result of the riot, PBS sought emergency funding for damage repairs and began a large-scale cleanup effort. *Id.* ¶¶ 13-14. This included boarding damaged windows and cleaning away glass and debris inside the Federal Building's main lobby. *Id.* ¶ 14. Due to building cleanup efforts and safety verifications, the Federal Building remained closed until around February 9, 2026. *Id.* ¶ 15. In the following weeks, PBS's acquisition process for the security fence moved forward while FPS coordinated extra security. *Id.* ¶ 16. Nevertheless, substantial vandalism to the facility continued, including "additional broken windows, graffiti, and trash." *Id.* ¶¶ 17-18. Often, the graffiti contained vulgar and profane language. *Id.* ¶ 18. Photographs included in Exhibits A and B provide examples of graffiti, trash, and vandalism to the Federal Building and surrounding federal property.

Between April 28 and 30, 2026, Defendant oversaw the installation of the security fence. Exhibit A, ¶ 19. The fence is "non-scalable." Exhibit B, ¶ 11. Since the installation, federal tenants have been able to carry out their missions with far fewer disruptions. Exhibit A, ¶¶ 20-21; Exhibit B, ¶ 14. The security fence only restricts access to part of the plaza; a corner section—or "lower plaza"—traditionally used by speakers during demonstrations was left accessible. Exhibit A, ¶ 23; Exhibit B, ¶ 14. "ADA-accessible access to the lower plaza remains available, with measured clearances of approximately 48 inches between the security bollard planters, providing an accessible route into the area." Exhibit A, ¶ 23.

In addition to the original justifications for the security fence (protecting the Federal Building, its employees, and visiting members of the public), the security fence has become a safeguard while "GSA [] implement[s] security upgrades to the lobby." Exhibit B, ¶ 10. Defendant

**Page 3        Response to Plaintiff's Motion for a Preliminary Injunction**

is in the process of effectuating a "hardening project" for the Federal Building," which could take around eighteen months to complete, though the final schedule is still pending due to outstanding approvals and planning steps. Exhibit A, ¶ 21. This project includes the procurement and installation of riot glazing. *Id.* "FPS will reevaluate its recommendation [for the presence of the security fence] at the conclusion of the [hardening] project." Exhibit B, ¶ 13. Repair and improvement efforts are ongoing, and "[g]iven the condition of the lobby, removal of the fence would compromise the security of the facility." Exhibit A, ¶ 21. According to FPS, removing the fence before "all necessary security upgrades are completed and the risk of harm to the facility and its occupants is substantially mitigated.." Exhibit B, ¶ 13.

Defendant has not ceased to accept permits for use of the full plaza. Exhibit A, ¶ 22. These permits are known as "Use of Space" permits. *Id.* To request a permit, an individual submits a GSA Form 3453. Application/Permit for Use of Space in Public Buildings and Grounds, *available at* https://www.gsa.gov/system/files/GSA3453-16i%5B1%5D.pdf. The last Use of Space permit submitted to Defendant was on June 5, 2024. *Id.* Defendant has no record of a Use of Space permit submitted by any Plaintiff since the placement of the security fence. *Id.* However, Defendant does have a record of Plaintiff Michael Carrigan's submission of a Use of Space permit in November 2020. *Id.*

B.  Procedural Background

On June 4, 2026, Plaintiffs filed a Complaint alleging four violations of the APA, 5 U.S.C. § 706(2)(A)-(D). Comp., ECF No. 1 at 10-14. The Complaint concerned Defendant's construction of the security fence and the limitations it imposed on access to the full plaza. *Id.* at 8-9. Plaintiffs alleged that the security fence compromised their ability to fully exercise their First Amendment rights. *Id.* at 2-8. They cited a range of harms, including less room for public gatherings, reduced

**Page 4**        **Response to Plaintiff's Motion for a Preliminary Injunction**

access to benches, and fewer routes to navigate federal grounds. *Id.*

On June 8, 2026, Plaintiffs filed their Motion, seeking an ex parte temporary restraining order (TRO) and preliminary injunction to prevent Defendant from maintaining the security fence. Mot. TRO/PI, ECF No. 4 at 1. The Court issued an Order on the Motion the same day. Order on TRO/PI Mot. & Sched., ECF No. 12. The Court found no indication Defendant had appeared or been served with the Complaint or Motion. *Id.* It then denied the TRO for Plaintiffs' failure to satisfy both requirements of Fed. R. Civ. P. 65(b)(1). *Id.* The Court set a briefing schedule on the Motion for a preliminary injunction and ordered the Clerk to give notice to Defendant about the Order. *Id.* The Court then modified the briefing schedule at Defendant's request. Order Update Sched., ECF No. 20.

## II.    LEGAL STANDARD

### A.  Preliminary Injunctions

#### i.   *The* Winter *Test*

"A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (internal quotation marks omitted). To warrant such relief, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

The first factor—likelihood of success on the merits—is the most important. *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019). A "court need not consider the other factors if a movant fails to show a likelihood of success on the merits." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (internal quotation marks omitted). Under the second factor, the existence of a

**Page 5        Response to Plaintiff's Motion for a Preliminary Injunction**

colorable First Amendment claim can establish irreparable harm. *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). The third factor "concerns the burdens or hardships to [the plaintiff] compared with the burden on [the defendant] if an injunction is ordered." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Where a movant raises serious First Amendment questions, the balance of hardships tips in the movant's favor. *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). The fourth factor "mostly concerns the injunction's impact on non-parties rather than parties." *Poretti*, 11 F.4th at 1050 (internal quotation marks omitted). "It is always in the public interest to prevent the violation of a party's constitutional rights." *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Ninth Circuit also applies a "sliding scale" approach to preliminary injunctions. *Doe v. San Diego Unified Sch. Dist.*, 14 F.4th 1173, 1177 (9th Cir. 2021). Under that approach, "a preliminary inunction could issue where the likelihood of success on the merits is such that serious questions going to the merits were raised and the balance of hardships tips sharply" in the plaintiff's favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (internal quotation marks omitted). This is known as the "serious questions" test. *Newport Fishermen's Wives, Inc. v. United States Coast Guard*, 813 F. Supp. 3d 1209, 1212 (D. Or. 2025).

ii.   *Preliminary Injunctions in the First Amendment Context*

The Ninth Circuit has "articulated a unique likelihood-of-success standard in First Amendment cases." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). "[T]he moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the

**Page 6**       **Response to Plaintiff's Motion for a Preliminary Injunction**

government to justify the restriction on speech." *Cal. Chamber of Commerce v. Council for Educ. Research on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (internal quotation marks omitted).

Within that framework, Ninth Circuit courts assess First Amendment claims in three steps. *Meinecke*, 99 F.4th at 521. Courts must: (1) "decide whether the relevant speech is protected"; (2) "identify the nature of the forum"; and (3) assess whether the restriction satisfies the requisite standard. *Id.* Under the third factor—whether a restriction satisfies the requisite standard—there is a distinction between content-based and content-neutral restrictions. *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017). "Content-based regulations—those that target speech based on its topic, idea, or message—are presumptively invalid," and "[t]o survive they must pass strict scrutiny." *Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020). A content-neutral regulation, in contrast, is one that "does not, on its face, discriminate on the basis of content," "can be justified without reference to the content of the regulated speech," and is not "adopted . . . because [the government] disagreed with the message conveyed" by a speaker. *Recycle for Change*, 856 F.3d at 671.

The government may issue reasonable time, place, or manner restrictions; they will pass constitutional muster if they are: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information. *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009). "A speech regulation is narrowly tailored if it promotes a substantial government interest that would be achieved less effectively absent the regulation." *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1200 (9th Cir. 2016) (internal quotation marks omitted). Narrow tailoring "need not be the least restrictive or least intrusive means" of accomplishing the government's significant interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989). Promoting public safety is a

**Page 7**        **Response to Plaintiff's Motion for a Preliminary Injunction**

significant government interest. *Carmenzind v. Cal. Exposition & State Fair*, 84 F.4th 1102, 1114 (9th Cir. 2023). The government also has a significant interest in promoting aesthetics in public places. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296 (1984); *Reed v. Town of Gilbert*, 587 F.3d 966, 980 (9th Cir. 2009). And the Supreme Court has recognized "protecting property rights" as a significant government interest. *McCullen v. Coakley*, 573 U.S. 464, 486-87 (2014).

### iii. Prohibitory Injunctions Versus Mandatory Injunctions

"A preliminary injunction can be either a prohibitory injunction or a mandatory injunction." *Clark v. Weber*, 557 F. Supp. 1010, 1014 (C.D. Cal. 2021). A prohibitory injunction prevents a party from taking action, preserving the status quo until the court can make a merits determination. *Marlyn Nutraceuticals, Inc. v. Mucos Pharm. GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009). A mandatory injunction, in contrast, "orders a responsible party to take action." *N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024) (internal quotation marks omitted). Mandatory injunctions are "particularly disfavored under the law of this circuit," and a court should deny such relief "unless the facts and law clearly favor the moving party." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal quotation marks omitted). In doubtful cases, a court should not issue a mandatory injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

### B.  The Administrative Procedure Act

"In addition to prescribing procedures for agency action, the APA delineates the basic contours of judicial review of such action." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 391 (2024). Under 5 U.S.C. § 706, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." Section

706(2) identifies six categories of impermissible agency decisions that courts will "hold unlawful and set aside." Additionally, "[t]o bring a claim under 5 U.S.C. § 706(2), plaintiffs must identify a final agency action." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010). A final agency action is one that "mark[s] the consummation of the agency's decisionmaking process" and results in the determination of rights, obligations, or legal consequences. *Bennet v. Spear*, 520 U.S. 154, 178-79 (1997) (internal quotation marks omitted).

   *i.*    *5 U.S.C. § 706(2)(A)*

Under 5 U.S.C. § 706(2)(A), a court must decide whether an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." An agency action is arbitrary and capricious where the agency has "relied on factors which Congress has not intended it to consider," "entirely failed to consider an important aspect of the problem," "offered an explanation . . . that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

   *ii.*    *5 U.S.C. § 706(2)(B)*

Under 5 U.S.C. § 706(2)(B), a court evaluates whether an agency has acted in a manner "contrary to constitutional right, power, privilege, or immunity." "APA claims advanced on the basis of constitutional rights, under § 706(2)(B), require an independent judicial determination of the litigant's rights," so "it matters not whether the claim is styled under the APA or the Constitution itself." *George v. United States*, 901 F. Supp. 2d 1179, 1184 (N.D. Cal. 2012).

   *iii.*    *5 U.S.C. § 706(2)(C)*

Under 5 U.S.C. § 706(2)(C), a court asks whether an agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." This is also known as an ultra

**Page 9**    **Response to Plaintiff's Motion for a Preliminary Injunction**

vires action. *Stenson Tamaddon, LLC v. IRS*, 742 F. Supp. 3d 966, 989-90 (D. Ariz. 2025). "[W]hen analyzing whether an agency ha[s] properly acted within its statutory limits," a court reviews "agency interpretations of statutes de novo." *Novedades y Servicios, Inc. v. Fin. Crimes Enforcement Network*, 785 F. Supp. 3d 785, 802 (S.D. Cal. 2025). This requires courts to exercise their own independent judgment, as directed by *Loper Bright*. *China Unicom (Ams.) Operations, Ltd. v FCC*, 124 F.4th 1128, 1142-43 (9th Cir. 2024). An agency's act is ultra vires if done "without any authority whatever"—it requires a "lack of delegated power," not merely a "claim of error in the exercise of that power." *Kalispel Tribe of Indians v. DOI*, 999 F.3d 683, 691 (9th Cir. 2021) (internal quotation marks omitted).

   iv.  *5 U.S.C. § 706(2)(D)*

Under 5 U.S.C. § 706(2)(D), a court examines whether an agency has acted "without observance of procedure required by law." "The Ninth Circuit has construed claims under this section to refer to agency rulemaking and the adequacy of the agency's notice and comment procedure." *Ferreira v. Mayorkas*, 767 F. Supp. 3d 929, 936 (N.D. Cal. 2025) (internal quotation marks omitted). Additionally, the Ninth Circuit has occasionally reviewed other procedurally governed agency actions under 5 U.S.C. § 706(2)(D), such as denials of employment certifications. *Yong v. Reg'l Manpower Admin.*, 509 F.2d 243, 246 (9th Cir. 1975). "Unlike substantive challenges, . . . [a court's] review of an agency's procedural compliance is exacting, yet limited. . . . [The] review [is] de novo but limited to ensuring that statutorily prescribed procedures have been followed." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (internal quotation marks and citations omitted).

### III.    LEGAL ARGUMENT

A. <u>Plaintiffs have not demonstrated they are likely to succeed on the merits of their APA claims.</u>

i.    *5 U.S.C. § 706(2)(A): Arbitrary and Capricious*

Plaintiffs have not carried their burden of demonstrating they are likely to succeed on the merits of their 5 U.S.C. § 706(2)(A) claim. Plaintiffs contend Defendant acted arbitrarily and capriciously because it built the security fence illegally, did so without justification (including setting the duration at two years), and failed to consider the full scope of the problem and reasonable alternatives. ECF No. 1 at 10-12; ECF No. 4 at 10-11. To demonstrate Defendant's action was arbitrary and capricious, Plaintiffs must ultimately show that Defendant "relied on factors which Congress has not intended it to consider," "entirely failed to consider an important aspect of the problem," "offered an explanation . . . that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Given the factual record, Plaintiffs have not demonstrated a likelihood of success on the merits under these standards.

By mid-January 2026, the FSC was considering increased security measures because of disruptions to federal business from high-frequency protest activities. Exhibit A, ¶¶ 2, 4. Some of these disruptions were severe, as in the case of the VA and the veterans visiting the agency for government services. *Id.* ¶ 5. In response, the FSC approved the installation of a temporary security fence, similar to one utilized in the past at the Hatfield Courthouse in Portland. *Id.* ¶ 7. Then, on January 30, 2026, a riot ensued, resulting in substantial damage to the Federal Building and its temporary closure. *Id.* ¶¶ 10-15. Vandalism continued in the following weeks, including a rock

thrown through the office window of an SSA administrative law judge and profane graffiti placed on permanent fixtures throughout the Federal Building grounds. *Id.* ¶¶ 16-19. During this time, PBS continued moving forward with its acquisition process for the security fence, which was installed by April 30, 2026. *Id.* ¶¶ 16, 19. PBS also initiated a hardening project for the Federal Building, which it estimated would take eighteen months to complete. *Id.* ¶ 21. In the meantime, Defendant left a portion of the plaza accessible for public gatherings and retained its process for members of the public to obtain Use of Space permits to host gatherings in the full plaza. *Id.* ¶¶ 22-23.

Defendant's actions were not arbitrary or capricious. An agency action may be arbitrary or capricious if the agency "entirely failed to consider an important aspect of the problem," "offered an explanation . . . that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Ass'n*, 463 U.S. at 43. Here, Defendant placed the security fence in response to a difficult security problem—ensuring the safety, security, and continuity of operations for federal property, federal employees, and members of the public accessing federal services. At the same time, Defendant sought to provide the public with a reasonable opportunity to continue exercising First Amendment rights by positioning the security fence so that the lower plaza remained open for First Amendment activities. Defendant also retained a process for individuals to obtain Use of Space permits when seeking access to the full plaza. The security fence's duration has been tied to security needs, most importantly GSA's estimate of the time it would take to complete the hardening project on the Federal Building.

Plaintiffs have also failed to show that the security fence is illegal or that Defendant relied on an impermissible basis when constructing it. Those arguments are addressed below in Sections

**Page 12        Response to Plaintiff's Motion for a Preliminary Injunction**

III.A.ii-iv. However, to summarize, the security fence is a reasonable time, place, or manner restriction under the First Amendment, and Plaintiffs have not specified an actual legal prohibition against Defendant's placement of the security fence. Instead, Defendant erected the security fence in response to security, remediation, and continuity-of-operations concerns and did so after following a process outlined in an executive order. Accordingly, Plaintiffs have not satisfied their burden of showing a likelihood of success on the merits under 5 U.S.C. § 706(2)(A).

        *ii.*      *5 U.S.C. § 706(2)(B): Contrary to Constitutional Right*

Plaintiffs have not shown they are likely to succeed on the merits of their 5 U.S.C. § 706(2)(B) cause of action. They argue that the security fence violates their First Amendment rights and that Defendant cannot justify its restrictions on speech. ECF No. 1 at 12; ECF No. 4 at 11-12. Plaintiffs' arguments fail because the security fence is a reasonable time, place, or manner restriction.

Initially, and for the purposes of responding to this Motion, Defendant will not contest that Plaintiffs seek to engage in protected speech or that the plaza is a traditional public forum. *Occupy Eugene v. GSA*, 43 F. Supp. 3d 1143, 1152 (D. Or. 2014). Turning to another threshold matter, the security fence should be treated as a content-neutral restriction on speech. Plaintiffs have not alleged that GSA has targeted speech "based on its topic, idea, or message." *Recycle for Change*, 856 F.3d at 669. Nothing in the record indicates that the restriction at issue facially "discriminate[s] on the basis of content" or that Defendant built the security fence because it disagreed with a specific message. *Id.* Further, the security fence "can be justified without reference to the content of the regulated speech," *id.*; Defendant placed the security fence to ensure the safety of federal property and occupants and to permit the completion of repairs and renovations.

As a content-neutral restriction on speech, the security fence is a permissible time, place,

**Page 13**        **Response to Plaintiff's Motion for a Preliminary Injunction**

or manner restriction if it is narrowly tailored to serve a significant government interest and leaves open ample alternative channels for communication of the information. *Berger*, 569 F.3d at 1036. The security fence serves three significant government interests: (1) public safety; (2) protection of property; (3) and aesthetics. *McCullen*, 573 U.S. at 486-87; *Carmenzind*, 84 F.4th at 1114; *Reed*, 587 F.3d at 980. Specifically, Defendant placed the security fence to safeguard federal employees and members of the public from ongoing harassment, prevent ongoing vandalism to the Federal Building, and allow repairs, maintenance, and renovation to the structure and grounds. In addition, the security fence is a narrowly tailored restriction on speech that leaves open ample alternate channels for communication. The lower plaza remains open for First Amendment activities, the public can obtain Use of Space permits to host events in the full plaza, and the security fence has a limited duration that is tied to the significant interests Defendant seeks to vindicate.

*Coalition to Protest the Democratic National Convention v. City of Boston*, 327 F. Supp.2d 61 (D. Mass. 2004), is a helpful example. There, for the upcoming Democratic National Convention, the City of Boston Police Department and United States Secret Service established various security zones around the FleetCenter (which was hosting the event) and the nearby Thomas P. O'Neill Federal Building. *Id.* at 65. This included a demonstration zone for up to 1,000 people surrounded by concrete barriers and chain fences lined with mesh fabric. *Id.* at 67. One set of plaintiffs, who wished to stage a rally during the convention, filed a motion for a preliminary injunction because they were dissatisfied with the demonstration zone. *Id.* at 68. Although the demonstration zone was next to the bus terminal being used by delegates and their guests, the fence prevented many of those attendees from seeing or interacting with protesters in the demonstration zone, and it was impossible to pass leaflets through at any point. *Id.* The plaintiffs asked for an injunction "ordering alterations in the fencing and concrete [] barriers." *Id.* at 76.

**Page 14      Response to Plaintiff's Motion for a Preliminary Injunction**

The *Coalition* court declined to grant the injunction. *Id.* at 78. It reasoned that the design of the demonstration zone was "narrowly tailored in light of other opportunities for communication" in nearby, lesser security zones. *Id.* at 75. The court found that the fence's construction was reasonable given law enforcement's public-safety concerns, such as protesters pushing over a less sturdy fence, liquids being squirted past a fence without mesh fabric, and objects being thrown over a lower fence. *Id.* The security precautions were reasonable" due to law enforcement's "past experience at comparable events." *Id.* at 76. Altering the demonstration zone could endanger delegate safety because of space constraints. *Id.* "In short, there [was] no way to 'tweak' the [demonstration zone] to improve plaintiffs' free speech opportunities without increasing a safety hazard." *Id.* The court found that "the circumstance [was] a sad one, but not one which [it was] authorized to second guess on [the] record." *Id.* at 78.

Here, as in *Coalition*, Defendant erected a security fence to address an ongoing, serious security challenge. Defendant, like the government actors in *Coalition*, provided alternatives for free expression to the extent possible given the attendant risks to public safety. And Defendant, like law enforcement in *Coalition*, based its decision to build the security fence on past incidents of concrete harm. Under these circumstances, Defendant's construction of the security fence was a reasonable time, place, or manner restriction, and therefore Plaintiff's have failed to demonstrate a likelihood of success on the merits of their 5 U.S.C. § 706(2)(B) claim.

### iii.    *5 U.S.C. § 706(2)(C): In Excess of Legal Authority*

Plaintiffs have not demonstrated they are likely to succeed on the merits of their 5 U.S.C. § 706(2)(C) challenge. Plaintiffs contend that Defendant acted beyond its power under 40 U.S.C. § 3306(b). ECF No 1 at 10; ECF No. 4 at 5-6, 13. Further, they argue that Defendant's decision was contrary to the restrictions of 42 U.S.C. §§ 4151-57. ECF No. 1 at 10; ECF No. 4 at 12-13.

**Page 15      Response to Plaintiff's Motion for a Preliminary Injunction**

However, a close examination of those statutes demonstrates that Plaintiffs have not cited authority showing Defendant's decision to place the security fence was outside its legal authority.

Under 40 U.S.C. § 3306, the Administrator of GSA is directed to follow certain precepts in its operation of federal properties. Section 3306(b)(3)—the provision Plaintiffs quote in their Complaint and Motion—states that the Administrator shall:

> provide and maintain space, facilities, and activities, to the extent practicable, that encourage public access to, and stimulate public pedestrian traffic around, into, and through, public buildings, permitting . . . uses of the area between the building and the street, so that the activities complement and supplement commercial, cultural, educational, and recreational resources in the neighborhood of public buildings.

GSA did not contravene this language. The provision contains a limitation ("to the extent practicable"), deferring to competing needs on federal property. As discussed, Defendant erected the security fence in response to increased, regular disruption of federal business, the January 30, 2026, riot, the compromised state of the Federal Building following the riot, and ongoing vandalism to federal property. Under those circumstances, the status quo was not "practicable." Further, GSA left the lower plaza open for public gatherings and retained the process for applicants to obtain Use of Space permits for the full plaza. In that way, it maintained space for pedestrian and neighborhood use "to the extent practicable" given operational and security concerns. Even if Plaintiffs disagree with the precise way GSA balanced security needs with public access, that amounts to a "claim of error in the exercise of [GSA's] power," not a successful showing that GSA acted "without any authority whatever." *Kalispel*, 999 F.3d at 691.

Turning to 42 U.S.C. §§ 4154-57, the codification of the Architectural Barriers Act of 1968, those provisions instruct GSA to "prescribe standards" for the "design, construction, and alteration of buildings . . . to insure whenever possible that physically handicapped persons will have ready

**Page 16        Response to Plaintiff's Motion for a Preliminary Injunction**

access to, and use of, such buildings." 42 U.S.C. §§ 4152-54a. As an initial matter, no Plaintiff personally alleges a disability. In any event, the statute merely instructs GSA to promulgate implementing regulations. To the extent Plaintiffs are arguing that GSA acted beyond its own regulations, they have not identified a specific provision at issue. Further, the statutory text contains a limiting clause: "whenever possible." And the regulations, found at 36 C.F.R. § 1191 apps. C and D, contain hundreds of exceptions to the general accessibility standards (which have intrinsic limits of their own). Ultimately, Plaintiffs cannot show that they are likely to succeed on the merits of this claim. They have not articulated an at-issue statute or regulation that either categorically constrained GSA's ability to raise the security fence or rendered its action "without any authority whatever." *Kalispel*, 999 F.3d at 691.

When GSA erected the security fence, it was not an ultra vires decision. On November 27, 2023, the White House issued an executive order titled "Interagency Security Committee" (EO 14111). Exec. Order No. 14111, 88 Fed. Reg. 83,809 (Dec. 1, 2023). The intent of EO 14111 was to "enhance the quality and effectiveness of security in and protection of [federal] buildings and facilities." EO 14111 Preamble. EO 14111 reestablished the Interagency Security Committee (Committee), which the President charged with promulgating policies and standards to secure and protect federal facilities. EO 14111 §§ 1 and 5. In 2024, the Committee issued a standard titled "The Risk Management Process" (Standard), which remains in force. Interagency Sec. Comm., The Risk Management Process, *available at* https://www.cisa.gov/resources-tools/resources/isc-standard-risk-management-process (last visited June 17, 2026). It outlines a process for evaluating and responding to security risks to a federal facility through an FSC. Here, it was the FSC's consideration of security measures that led it to approve the security fence, which GSA procured and put in place. Exhibit A, ¶¶ 7-8. Defendant was acting pursuant to EO 14111 and the Standard.

**Page 17      Response to Plaintiff's Motion for a Preliminary Injunction**

For these reasons, Plaintiffs have not shown they are likely to succeed on the merits of their 5 U.S.C. § 706(2)(C) challenge. Defendant's act of constructing the security fence was not ultra vires under any statute or regulation identified by Plaintiffs and was, instead, within its legal purview under EO 14111 and the Standard.

iv.     *5 U.S.C. § 706(2)(D): Failure to Follow Procedures*

Plaintiffs have not demonstrated they are likely to succeed on the merits of their 5 U.S.C. § 706(2)(D) claim. Plaintiffs argue that GSA was obligated to comply with the notice-and-comment rulemaking process before placing the security fence. ECF No. 1 at 13; ECF No. 4 at 13. However, notice-and-comment rulemaking was not necessary to erect a security fence.

A "rule" is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). "Rule making," in turn, means "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). The notice-and-comment process found at 5 U.S.C. § 553 only applies to "rule making."

Here, as discussed, Defendant placed the security fence after being advised that the FSC had approved it as a security countermeasure, as per the Standard. Defendant's action was not rulemaking. A review of *Chamberless Enterprises v. Redfield*, 508 F. Supp. 3d 101 (W.D. La. 2020), is instructive.

In *Chamberless Enterprises*, plaintiffs were residential landlords and an affiliated association that sought a preliminary injunction to set aside the defendant Center for Disease Control's 2020 eviction moratorium during the Covid-19 pandemic. *Id.* at 107-08. The plaintiffs argued that the moratorium was "void because the CDC failed to comply with the notice-and-

**Page 18        Response to Plaintiff's Motion for a Preliminary Injunction**

comment requirements that apply to legislative rules under the APA." *Id.* at 117. The court rejected plaintiff's argument. *Id.* at 118. It found that the moratorium was "not a rule" but rather an action taken under the existing authority of a regulation that expressly authorized the CDC's conduct. *Id.*

Here, as in *Chamberless Enterprises*, Defendant was taking a remedial action under existing authority. It was not making "an agency statement" related to "law or policy" or its own "organization, procedure, or practice requirements." 5 U.S.C. § 551(4). Accordingly, the notice-and-comment requirements of 5 U.S.C. § 553 were not in play. For this reason, Plaintiffs have not carried their burden of demonstrating they are likely to succeed on the merits of their 5 U.S.C. § 706(2)(D) claim.

B.   Plaintiffs have not satisfied the remaining three factors of the *Winter* test.

Under the *Winter* test, where a plaintiff cannot demonstrate a likelihood of success on the merits, a court "need not consider the other factors." *Baird*, 81 F.4th at 1040. Where, as here, the plaintiff seeks a "disfavored" mandatory inunction, ECF No. 4 at 15, the plaintiff's burden is further heightened—a court should deny such relief "unless the facts and law clearly favor the moving party," *Stanley*, 13 F.3d at 1320. For the reasons already stated, Plaintiffs have failed to clearly demonstrate a likelihood of success on the merits of their APA claims. Accordingly, the Court should deny their Motion. Nevertheless, the remaining *Winter* factors also weigh against granting Plaintiff's Motion.

Under the second factor, a court asks whether a plaintiff had shown "a likelihood of irreparable harm in the absence of preliminary relief." *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014). Here, Plaintiffs argue that the security fence has caused an irreparable harm because "larger vigils and other gatherings [are now] impossible" and the security fence "hinders or blocks entirely [bench] access for elders and others with mobility issues." ECF No. 4

**Page 19        Response to Plaintiff's Motion for a Preliminary Injunction**

at 13-14. These arguments are unavailing for two reasons.

First, access to the full plaza to host or attend larger gatherings is not "impossible." Use of Space permits have been available during the entire time the security fence has been in place. Exhibit A, ¶ 22. No Plaintiff has applied for a permit, despite at least one Plaintiff (Michael Carrigan) being familiar with the process from using it in the past. *Id.* Plaintiffs have not pointed to a permit denial for a gathering they wished to host or attend. Therefore, Plaintiffs have not shown they have suffered, or will suffer, an irreparable injury to their ability to gather for First Amendment activity.

Second, Plaintiffs' allegations about bench access have been made without reference to any precise constitutional, statutory, or regulatory entitlement. Meanwhile, "ADA-accessible access to the lower plaza remains available." Exhibit A, ¶ 23. Unless and until Plaintiffs articulate a specific, legally cognizable injury of this type, it is unclear how a preliminary injunction would remedy any harm actionable under the law.

Under the third and fourth factors, a court examines whether "the balance of equities tips in [the movant's] favor" and whether "an injunction is in the public interest," respectively. Cottrell, 632 F.3d at 1131 (internal quotation marks omitted). These factors merge where the government is the opposing party. *Nken*, 556 U.S. at 435. Here, Plaintiffs allege a First Amendment violation. It is true that where "where a movant raises serious First Amendment questions, the balance of hardships tips in the movant's favor," *Am. Beverage Ass'n*, 916 F.3d at 758, and the prevention of constitutional violations is in the public interest, *de Jesus Ortega Melendres*, 695 F.3d at 1002. However, that does not mean these two factors automatically favor a plaintiff seeking a preliminary injunction for an alleged First Amendment violation. *Tyler v. Coeur d'Alene School Dist.*, 568 F. Supp. 3d 1071 (D. Idaho 2021), demonstrates this point.

**Page 20        Response to Plaintiff's Motion for a Preliminary Injunction**

*Tyler* involved a group of electioneers who had gathered in a public-school parking lot on election day and were handing out sample ballots and discussing election topics with parents. *Id.* at 1078. A security guard employed by the defendant school district asked the plaintiffs, who were among the electioneers, to leave the parking lot. *Id.* at 1079. The parties disagreed about whether the plaintiffs were simply asked to move to a nearby grassy area due to traffic congestion or told to leave school grounds because electioneering was disallowed. *Id.* Plaintiffs filed a lawsuit alleging viewpoint discrimination under the First Amendment and moved the court for a preliminary injunction preventing the school from preventing similar electioneering efforts. *Id.* Ultimately, the court denied the motion, in part because it found that the defendant's limitation on the plaintiff's speech was "reasonable and viewpoint neutral." *Id.* at 1089. When evaluating the third and fourth *Winter* factors, the court found they weighed against the plaintiffs, even though the defendants had restricted the plaintiff's First Amendment rights. *Id.* at 1092.

Here, as in *Tyler*, Plaintiffs' First Amendment arguments are unavailing (for the reasons discussed above), and any restriction on their Free Speech rights is outweighed by the public harms the preliminary injunction would cause. If the Court compels Defendant to remove or open the security fence, Defendant's ability to safeguard federal employees, federal property, and members of the public visiting the Federal Building for government services would be compromised. Defendant and FPS have recommended the retention of the security fence to ensure personal safety, property integrity, necessary repairs and renovations to the Federal Building, and continuity of operations.

Finally, the equities and public interest weigh in Defendant's favor because Plaintiffs rested on their rights. On June 8, 2026, Plaintiffs asked this Court for an ex parte temporary restraining order and now claim an urgent need for the extraordinary, disfavored remedy of a mandatory

**Page 21        Response to Plaintiff's Motion for a Preliminary Injunction**

preliminary injunction. Yet, Plaintiffs admit they have been aware of Defendant's plan to construct the security fence since February 2026. ECF No. 4 at 7. The security fence has been in place since April 30, 2026. Plaintiffs nevertheless waited thirty-nine days—until June 8, 2026—to file their Motion. That delay not only undermines the veracity of their claim that they have an imminent need for injunctive relief. It also prejudices Defendant. In addition to paying for the security fence, Defendant also moved forward with repairs, renovations, and the resumption of the Federal Building's normal business activities under the belief that the security fence would be in place, as per the FSC's decision. Plaintiffs' delay in bringing suit would compound the hardship faced by Defendant were the Court to issue a preliminary injunction.

Plaintiffs have not demonstrated a likelihood of success on the merits of their APA claims (or even a serious question going to the merits), so the Court need not consider the final three *Winter* factors. However, those factors do not weigh in Plaintiffs' favor.

## CONCLUSION

For the reasons stated, the Court should deny Plaintiff's Motion for a preliminary injunction.

DATED this 17th day of June 2026.

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ James A. Blum*
JAMES A. BLUM
Assistant United States Attorney

*/s/ Tsechu Dolma*
TSECHU DOLMA
Assistant United States Attorney

Attorneys for Defendant

**Page 22**      **Response to Plaintiff's Motion for a Preliminary Injunction**