**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF OREGON**

| | |
|---|---|
| NAPHTALI RENSHAW; SUSAN BARNHART; TYRRAS WARREN; MICHAEL CARRIGAN; CHRISTOPHER ROMPALA; and CHARLES AREFORD; | CASE NO. 6:26-cv-1127-MTK<br><br>PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO |

Plaintiffs,

v.

GENERAL SERVICES
ADMINISTRATION,

Defendants.

Plaintiffs submit this reply in support of their motion for preliminary injunction

and temporary restraining order.

## I.    LEGAL TEST FOR INJUNCTION

The parties appear to agree that the following alternate tests apply in the Ninth

Circuit.

A plaintiff seeking a temporary restraining order or preliminary injunction must

establish four factors: (1) a likelihood of success on the merits, (2) likely irreparable harm

in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and

(4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008).

In the Ninth Circuit, courts may apply an alternative "serious questions" test

which allows for a preliminary injunction where a plaintiff shows that "serious questions

going to the merits" were raised and the balance of hardships tips sharply in plaintiff's

favor, assuming the other two elements of the *Winter* test are met. *Alliance for the Wild*

1    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
     INJUNCTION/TRO

*Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a stronger showing on one element may offset a weaker showing in another element. *Id*. at 1131.

The following additional tests apply.

When the government is a party, courts consider the last two factors together, because the equities for the State consist of the public interest in a case such as this. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Likelihood of success is the most important factor in the analysis, particularly where a plaintiff alleges a constitutional violation. *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). In the context of a First Amendment claim, if plaintiff "shows that it is likely to succeed on the merits, it has 'demonstrate[d] the existence of a colorable First Amendment claim' and established the requisite irreparable injury." *71Five. Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 749 (9th Cir. 2012). That Court went on to note: "Similarly, if 'we find that [the Rule] offends the First Amendment, . . . the balance of hardships favors" plaintiffs. *Id.*

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019).

## II.    PLAINTIFFS HAVE DEMONSTRATED CONSTITUTIONAL HARM CAUSED BY THE FENCE

2    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

The Declaration of Henry demonstrates that the usable public Plaza space has been reduced from about 50,000 square feet to about 5600 square feet – a nearly 90% reduction. Dkt 22.

Defendant's Turner Declaration admits that only 250 people can safely gather in the remaining space. Dkt 26 at 3. Numerous witnesses testified that historically, and on an ongoing basis, gatherings in the plaza have well exceeded that number.

In addition, numerous witnesses testified (and submitted declarations) documenting that people with mobility or health issues are limited in their First Amendment activity due to losing access to the shade, three benches, three picnic tables, and numerous sitting-level retaining walls in the upper plaza. Bif Hazelton was unable to attend in person, but submitted a declaration testifying that they use a wheelchair, and explained how the lack of access to shade from overhang limits their ability to use the space for First Amendment activity. Dkt 27.

## III.  PLAINTIFFS HAVE AT LEAST RAISED "SERIOUS QUESTIONS GOING TO THE MERITS"

For purposes of this motion, plaintiff focus on their claim that the building of the fence violations the U.S. Constitution, and therefore must be set aside pursuant to the Administrative Procedure Act, 5 U.S.C. 706(2)(B) (requiring the court to set aside any agency action that is found to be contrary to constitutional right or privilege).

### A.  The Building of the Fence is a Final Agency Action

Defendant does not appear to dispute this element.

### B.    Plaintiffs Have Raised Serious Questions that the Building of the Fence Violates the First Amendment of the Constitution

#### 1.    Defendant has the burden to justify its infringement of the First Amendment

The government sets forth the appropriate test on pages 6-7 of its brief (Dkt 24). The Ninth Circuit has "articulated a unique likelihood-of-success standard in First Amendment cases." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). "[T]he moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Cal. Chamber of Commerce v. Council for Educ. Research on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (internal quotation marks omitted).

Plaintiffs have presented abundant evidence making a colorable claim that their First Amendment rights have been infringed, and are threatened with ongoing infringement. The burden therefore shifts to the government to justify the restrictions on speech presented by the new fence.

#### 2.    The Plaza is a traditional public forum

As this Court has found, the area in question is indisputably a traditional public forum, based upon the abundant witness testimony; the GSA website (Dkt 30, 30-1 (Ex. J)); and indeed, defendant's own admissions in prior litigation, as noted in plaintiffs' motion. The Supreme Court has held that "'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'" *U.S. v. Grace*, 461 U.S. 171, 177, 103 S. Ct. 1702 (1983) (collecting cases). "Such traditional public forum property occupies a

4    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

special position in terms of First Amendment protection and cannot lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *Id*. at 180, 103 S. Ct. 1702.

### 3. The time, place, and manner test for traditional public forums

In order to impose restrictions on the time, place, or manner of protected speech in a public forum, the restriction must be "justified without reference to the content of the regulated speech . . . narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

A content-neutral, reasonable time, place, or manner restriction on free speech must be justified by showing that it is narrowly tailored to serve a significant government interest and that it leaves open ample alternative channels for communication of the information. *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009). A narrowly tailored regulation is one that does not "burden substantially more speech than is necessary" to achieve the government interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). Further, "the existence of obvious, less burdensome alternatives" is a relevant consideration when determining whether the restriction is reasonable. *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417 n. 13 (1993).

In *Berger*, the Seattle Center's Director had issued regulations requiring permitting for street performers in a public venue. 569 F.3d at 1034. In that case, the court found that the government's content-neutral time, place, and manner restrictions

5    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

were not narrowly tailored to serve the substantial interest of public safety and competing uses. *Id.* at 1041. The regulations marginally promoted the government's interest; less intrusive measures existed; and the regulation impacted far more people than those who caused the initial "evil." *Id.*

As the *Berger* court explained: "A narrowly tailored time, place, or manner restriction on speech is one that does not "burden substantially more speech than is necessary" to achieve a substantial government interest. *Ward,* 491 U.S. at 799. It must "target[ ] and eliminate[ ] no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz,* 487 U.S. 474, 485, 108 S. Ct. 2495 (1988) (citation omitted).

Moreover, although the chosen restriction "need not be the least restrictive or least intrusive means" available to achieve the government's legitimate interests, *Ward,* 491 U.S. at 798, the existence of obvious, less burdensome alternatives is "a relevant consideration in determining whether the 'fit' between ends and means is reasonable," *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417 n. 13, 113 S. Ct. 1505 (1993).

Similarly, in *Pinocci v. Flynn*, the plaintiff requested a preliminary injunction on a governmental entity's regulation that imposed a durational limit for political signage on the highway. 729 F. Supp. 3d 1060, 1064 (D. Mont. 2024). The court asserted that it was the defendant's burden to justify a content-neutral restriction without reference to the content of the speech. *Id.* at 1066. The court found in the plaintiff's favor, stating that the defendant's lack of interest in the limiting effect of its regulation was insufficient to override the plaintiff's colorable claim. *Id.* at 1067.

In *ACLU v. City of Las Vegas*, the Ninth Circuit struck down a ban on a content-

6    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

neutral leafleting ban as an improper time, place, and manner restriction, holding:

> Although the ban on leafleting is content-neutral, such an absolute ban is clearly not narrowly tailored, nor does it leave open ample alternative channels for communication. *Schneider v. New Jersey*, 308 U.S. 147, 162-63, 60 S. Ct. 146 (1939) (holding that prevention of littering is insufficient to justify prohibition on leafleting on public street). The injunction against the leafleting ordinance was properly granted under any standard, and thus we uphold the summary judgment and permanent injunction with regard to this subsection of the ordinance.

333 F.3d 1092, 1106 (9th Cir. 2003).

### 4. Defendant's fence is not a reasonable time, place, and manner restriction on First Amendment speech and activity

In the instant case, defendant GSA has failed to prove that the fence is a narrowly tailored regulation to serve its interest of public safety, property rights, and promoting aesthetics. Similarly to *Berger*, the Free Speech Plaza fence marginally promotes public safety. Few federal employees have access to keys unlocking the padlocked gates of the fence. This creates a serious public safety concern in the event of an emergency. Rather than protecting public safety, the Free Speech Plaza fence creates a public safety hazard.

Additionally, less intrusive measures exist for promoting public safety, property rights, and building aesthetics. Defendant testified that no alternative options were considered when different government agencies relayed concerns about the protests. For example, defendant failed to consider putting metal grating over the windows, which is obviously less intrusive and costly than installing a perimeter fence that blocks the ADA ramps onto the property.

Lastly, the Free Speech Plaza fence negatively impacts far more people than the individuals who caused damage to the property on January 30, 2026. As witnesses testified, many peaceful protestors who have disabilities, illnesses, or mobility issues can no longer practice their First Amendment rights, without access to the benches, picnic

7    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

tables, and ADA ramps that are locked behind the fence.

As in the *Pinocci* case, GSA simply stating that it is not interested in curtailing freedom of speech is insufficient to justify a content neutral restriction. GSA has failed to demonstrate that the fence is a narrowly tailored regulation to serve the interest of the safety of occupants and the building, and therefore has not overcome its burden under the First Amendment.

> **5.    Under the prior restraint doctrine, the government's interest in avoiding "disruption" cannot override the public's interest in use of Eugene's longstanding federal free speech plaza**

> The Supreme Court has emphasized that"'(a) system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S. Ct. 631, 639 (1963); *Freedman v. State of Maryland*, 380 U.S. 51, 57, 85 S. Ct. 734, 738 (1965). And even where this presumption might otherwise be overcome, the Court has insisted upon careful procedural provisions, designed to assure the fullest presentation and consideration of the matter which the circumstances permit. As the Court said in *Freedman v. State of Maryland*, *supra*, at 58, 85 S. Ct., at 739, a noncriminal process of prior restraints upon expression "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system."

*Carroll v. Pres. and Com'rs of Princess Anne*, 393 U.S. 175, 180-81 (1968).

"First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence." *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996). "The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct." *Id.* at 1371-72.

In particular, prior restraint in a public forum is subject to a high level of scrutiny. *NAACP W. Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984). "The

8    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

government may not prohibit angry or inflammatory speech in a public forum unless it is (1) 'directed to inciting or producing imminent lawless action' and (2) 'likely to incite or produce such action.'" *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (*per curiam*). "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

The fence constitutes a prior restraint on all protest activities in the upper plaza, and does not place a reasonable time, place, and manner restriction on protests outside the Eugene Federal Building. This is especially true given that the fence was approved by the Facility Security Committee before any claimed violent events of January 30, 2026, occurred. Decl. Ryan J. Anderson Supp. Def.'s Resp. to Pls.' M. Preliminary Injunction ¶ 4-7, Dkt No. 25. The FSC approved the fence on January 22, 2026, to "protect the tenants, members of the public, federal employees, and the Facility." *Id.* at ¶ 7. At this point, the conduct of protesters was only "aggressive and confrontational," *Id.* at ¶ 3, which does not justify a prior restraint on First Amendment activities based on the law of this circuit. *See Collins*, 110 F.3d at 1371–72; *Brandenburg*, 395 U.S. at 447; *Terminiello*, 337 U.S. at 4. Further, the government may not limit First Amendment rights to prevent past violence from occurring again. *Collins*, 110 F.3d at 1372. Because the government's reasoning for the fence constitutes a prior restraint on First Amendment speech, the fence is unconstitutional.

Defendant's focus on the disruptions allegedly caused by actions of those who are not before the Court is unavailing. As the Ninth Circuit noted in *Rosen v. Port of*

9       PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
        INJUNCTION/TRO

*Portland*:

> "'(A) function of free speech under our system of government is to invite dispute. It may indeed serve its high purpose best when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger . . . . ' *Terminello v. Chicago*, 337 U.S. 1, 4-5." *Edwards v. South Carolina*, 372 U.S. 229, 237-38, 83 S. Ct. 680, 684 (1963). To preserve this important function, it is the duty of the state to protect, rather than restrict, those who express unsettling views.

641 F.2d 1243, 1248-49 (9th Cir. 1981).

More than fifty years ago (shortly before the Plaza at issue was opened to the public), the Supreme Court noted in *Cohen v. California*:

> The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. . . .
>
> To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

403 U.S. 15, 24-25, 91 S. Ct. 1780 (1971) (citation omitted).

As the Ninth Circuit explained in *Collins*: "As a matter of law, it was clear at that time, as it is today, that the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter)." 110 F.3d at 1372. The *Collins* court went on to hold:

10    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

The law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence. There are sound reasons for this rule. Demonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate. Some of these demonstrations may become violent. The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, *see, e.g., Cox v. Louisiana*, 379 U.S. 536, 551, 85 S. Ct. 453, 462-63 (1965), and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure. *Kunz*, 340 U.S. at 294-95, 71 S. Ct. at 315-16. Courts have many times emphasized the importance of government's permitting the public to engage in spontaneous First Amendment activity, such as demonstrations, in response to controversial events. *E.g., NAACP Western*, 743 F.2d at 1346; *see also Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Banning or postponing legitimate expressive activity because other First Amendment activity regarding the same subject has resulted in violence deprives citizens of their right to demonstrate in a timely and effective fashion.

*Collins*, 110 F.3d at 1372–73.

In the context of the Portland Hatfield federal building, this Court applied this prior restraint case law. *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120 (D. Or. 2020). In that case, this court noted:

The Ninth Circuit has stated: Demonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate. Some of these demonstrations may become violent. The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure. *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996) (citation omitted)."

480 F. Supp. 3d at 1124-25.

### 6. Defendant's citation to a permitting scheme does not make the fence constitutional

As Judge Aiken recently noted in the *Black Unity v. Springfield* case, permitting schemes are often struck down as unconstitutional because they do not accommodate

11    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

spontaneous protests, and/or have procedural requirements that are an improper prior restraint, and/or provide the government with excessive discretion to modify or deny the permit. 2026 WL 183363, No. 6:21-cv-00346-AA (Jan. 23, 2026) at *17. As Judge Aiken noted:

> The law is particularly vigilant about government officials' discretion to impose unguided (standardless) restrictions on street marches. *See, e.g., Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 799 (9th Cir. 2008) (striking down a parade permit scheme that afforded police "excessive discretion" to modify street march permits "in the interest of vehicular or pedestrian safety") (collecting cases); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 827 (9th Cir. 2019) ("To pass constitutional muster, . . . a [municipal parade] permit system must not delegate overly broad licensing discretion to a government official."); *NAACP v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) ("Unfettered discretion to license speech cannot be left to administrative bodies" because "[s]uch discretion grants officials the power to discriminate and raises the spectre of selective enforcement on the basis of the content of speech.").

Advance notice/permitting provisions may not delegate unfettered licensing discretion to a government official and must be narrowly tailored to serve a significant government interest. *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992).

In *NAACP, Western Region v. City of Richmond*, the Ninth Circuit explained:

> [A]ll advance notice requirements tend to inhibit speech. The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations discourages citizens from speaking freely. *See Rosen v. Port of Portland*, 641 F.2d 1243, 1249 (9th Cir. 1981). Second, the delay inherent in advance notice requirements inhibits speech. By requiring advance notice, the government outlaws spontaneous expression. Immediate speech can no longer respond to immediate issues. The quantity of effective speech is limited. For these reasons, we have struck down an ordinance that required one business day's advance notice by those who wished to distribute literature or otherwise communicate with the public at an airport. *Id.*

743 F.2d 1346, 1355-56 (9th Cir. 1984). The court went on to note:

12    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
      INJUNCTION/TRO

"[T]iming is of the essence in politics . . . . [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 163, 89 S. Ct. 935, 945 (1969) (Harlan, J., concurring). A delay "of even a day or two" may be intolerable when applied to " 'political' speech in which the element of timeliness may be important." *Carroll v. Commissioners of Princess Anne,* 393 U.S. 175, 182, 89 S. Ct. 347, 352 (1968). *See Wood v. Georgia,* 370 U.S. 375, 392, 82 S. Ct. 1364, 1374 (1962). Parades are public events. Participatory enthusiasm is vital to their success. The size of a crowd and its enthusiasm for a cause may generate sufficient passion to sway the undecided. Thus, simple delay may permanently vitiate the expressive content of a demonstration. A spontaneous parade expressing a viewpoint on a topical issue will almost inevitably attract more participants and more press attention, and generate more emotion, than the "same" parade 20 days later. The later parade can never be the same. Where spontaneity is part of the message, dissemination delayed is dissemination denied.

*Id*. Finally, the *NAACP* court noted that, even if a permit requirement is facially neutral, "there is no equality in a law prohibiting spontaneous parades on both topical and perennial issues." *Id*.

Advance notice requirements of this length and shorter have consistently been struck down by courts. *See Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 14 Cal.App.4th 312 (Cal. Ct. App. 1993) (thirty-day advance notice requirement unconstitutional); *Douglas v. Brownell*, 88 F.3d 1511 (8th Cir. 1996) (five-day notice requirement for municipal parade permit unconstitutional); *Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007) (thirty-day permit violated organizers' speech and assembly rights). Advance notice requirements that have been upheld have typically been shorter than a week. *See A Quaker Action Group v. Morton*, 516 F.2d 717, 735 (D.C. Cir. 1965) (upholding two-day notice requirement); *Jackson v. Dobbs*, 329 442 F.2d 928 (5th Cir. 1971) (upholding ordinance requiring paraders to acquire permit by the day before); *Powe v. Miles,* 407 F.2d 73, 84 (2d Cir. 1968) (upholding two-day notice requirement).

Here, it appears that, although some permits have been granted within 72 hours,

13    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

they can take at least as long as ten days – far beyond what is responsive to a spontaneous protest at the Plaza.

Furthermore, providing a permit process does not correct the problems inherent in fencing off the Plaza. As this Court noted, even assuming that a permit would be granted for the upper plaza, the existing fence and gates present significant safety issues, trapping hundreds of protesters within an enclosed space with only three gates.

In addition, Anderson's testimony indicated that the current process has become quite elaborate, with layers of review, including in Washington D.C. Presumably the permit process would now take even longer than before. And Anderson indicated that the FSC could veto a permit based on "security" issues.

That said, the testimony made clear that people have never been aware of the "courtesy" permit process; and the government has never required a permit for use of the Plaza, and should not now be allowed to impose such a scheme as a condition of using the previously open upper Plaza.

The form referred to in defendant's declarations cites a form that cites to a C.F.R. -- 41 CFR Part 102-74 - Subpart D - Occasional Use of Public Buildings. That C.F.R. no longer appears to exist.  On December 16, 2025, GSA aligned their regulations with Executive Order 14192 by removing the CFR section noted on the GSA form from GSA's regulatory system (90 FR 58408-01).

That said, a cursory review of the prior regulations indicates that the federal government retains significant discretion over such a permit application, with delays to be expected:

> o **§ 102-74.480 How many days does a Federal agency have to issue a permit following receipt of a completed application?**

14    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
      INJUNCTION/TRO

- Federal agencies must issue permits within 10 working days following the receipt of the completed applications, unless the permit is disapproved in accordance with § 102-74.500.

- **§ 102-74.495 If a permit involves demonstrations or activities that may lead to civil disturbances, what action must a Federal agency take before approving such a permit application?**

    - Before approving a permit application, Federal agencies must coordinate with their law enforcement organization if a permit involves demonstrations or activities that may lead to civil disturbances.

- **§ 102-74.500 Can Federal agencies disapprove permit applications or cancel issued permits?**

    - Yes, Federal agencies may disapprove any permit application or cancel an issued permit if—

        - The applicant has failed to submit all information required under §§ 102-74.470 and 102-74.475, or has falsified such information;

        - The proposed use is a commercial activity as defined in § 102-71.20 of this chapter;

        - The proposed use interferes with access to the public area, disrupts official Government business, interferes with approved uses of the property by tenants or by the public, or damages any property;

        - The proposed use is intended to influence or impede any pending judicial proceeding;

        - The proposed use is obscene within the meaning of obscenity as defined in 18 U.S.C. 1461-65; or

        - The proposed use violates the prohibition against political solicitations in 18 U.S.C. 607.

## IV.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF ISSUING A TEMPORARY RESTRAINING ORDER

The court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at

15    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

24.

The public interest inquiry, by contrast, "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).

When, as here, the government is a party to the action, these factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Here, the balance of equities and the public interest weigh in favor of issuing a temporary restraining order and preliminary injunction. Plaintiffs – some for decades – have exercised their clearly protected First Amendment rights at the Free Speech Plaza at the Eugene federal building, and are now blocked from doing so in large part.

In addition, the public in general is likely to be chilled by this government action, reducing their likelihood of expressing their opinions, and gutting quintessential democratic freedoms.

People with mobility issues have no benches to rest on, and less relief from heat and street noise/fumes.

In contrast, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). *See also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding that although "[t]here is generally no public interest in the perpetuation of unlawful agency action," "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation'").

16    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
      INJUNCTION/TRO

## V.  REMOVAL OF THE FENCE IS APPROPRIATE RELIEF

The function of a preliminary injunction is to preserve the status quo *ante litem* -- "'the last, uncontested status which preceded the pending controversy.'" *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir. 1963) (citation omitted).

Plaintiffs' requested relief – removal of the fence -- is a prohibitory injunction rather than, as Defendant argues, a mandatory injunction. A mandatory injunction "alters the status quo by requiring a party to take action." *Youth 71Five Ministries v. Williams*, 160 F.4th 964, 978 (9th Cir. 2025), *appeal docketed*, 25-776 (U.S. Jan, 02, 2026). A prohibitory injunction "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharm. GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009)). In other words, a prohibitory injunction seeks to prevent the parties from changing the status quo until the merits can be decided. *Youth 71Five Ministries*, 160 F.4th at 978.

The status quo is the "legally relevant relationship between the parties . . . before the action challenged in the complaint occurred." *Id.* (quoting *Ariz. Dream Act Coal.*, 757 F.3d at 1061. In this case, the status quo is the unfenced plaza outside the Eugene Federal Building. Plaintiffs challenge Defendant's actions that erected the fence blocking the upper plaza. This status was uncontested until Defendants erected the fence in controversy in this case. Thus, the status quo the court should seek to preserve is unrestricted access to the upper plaza.

When the defendant's actions "affirmatively changed" the status quo and the plaintiff's motion "seeks to restore that status quo," the requested relief is a prohibitory

17   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
     INJUNCTION/TRO

injunction. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023). In that case, students sought a preliminary injunction to prevent the school district from derecognizing their religious club that had enjoyed a special recognized club status for almost twenty years. *Id.* at 675, 77, 84-85. The Ninth Circuit found that the status quo considered for the preliminary injunction was the club status before the club was derecognized. *Id.* at 685. The court held this in part because the club and school district had a "longstanding relationship" and had enjoyed special club status for almost twenty years without issue. *Id.* Defendants affirmatively changed this status quo when they derecognized the club against the objection of club leadership. *Id.* Because the plaintiffs seeking a preliminary injunction were asking the court to return the club to the status quo, the Ninth Circuit held that the club was seeking a prohibitory injunction. *Id.*

In this case, as with the defendants in *Fellowship of Christian Athletes*, defendant affirmatively changed the status quo by erecting a fence that blocks off an overwhelming portion of the plaza that was open since the 1970s. In *Fellowship of Christian Athletes*, defendants took away club benefits to a religious club in the school that the club had enjoyed for almost twenty years without issue. In this case, Defendant took away access to the upper plaza that protestors and the public had enjoyed for almost fifty years. In both cases, defendants affirmatively stripped plaintiffs of the status quo they had relied on for decades. In *Fellowship of Christian Athletes*, the Ninth Circuit held that plaintiffs sought a prohibitory injunction because defendants affirmatively changed the status quo, and the Court in this case should similarly hold that plaintiffs in this case are seeking a prohibitory injunction, because defendant affirmatively changed the status quo.

18    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

Plaintiffs ask this Court to issue a prohibitive injunction returning the upper plaza to the status quo. Here, the status quo is access to the upper Plaza without the fence Defendant erected. Because defendant affirmatively changed this status quo by erecting a fence that cut off Plaintiffs' access to the upper Plaza, plaintiffs seek a prohibitive injunction to return the upper Plaza to this status quo.

The crafting of the injunction is within the court's equitable powers. As the Ninth Circuit noted in *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004): "A district court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." "The essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987).

The reasons given by counsel on June 22, 2026 for why the fence was set at the perimeter ("probably geometry") are not in evidence. But Mr. Anderson addressed this in his testimony on June 18. When the Court asked him what the minimum setback required to complete repairs was, Anderson answered that the way the fencing lined up with the topography/property line was the "easiest, fastest way" to get the fence up. In response to the Court's questioning as to whether there had been discussion between Anderson and Turner or between Turner and FSC about considering use of courtyard/upper plaza by the public when determining where to put the fence, Anderson responded that no, the only discussion was to keep the lower plaza available.

## VI.    LACHES IS AN INAPPROPRIATE DEFENSE IN THIS CASE

Plaintiffs did not "rest on their rights." This is at heart a "laches" defense.

Laches is an equitable defense that limits the time in which a party may bring suit.

19    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
       INJUNCTION/TRO

*Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 835 (9th Cir. 2002). It derives from the maxim that a party who sleeps on his rights loses his rights. *Miller v. Glenn Miller Prods., Inc*., 454 F.3d 975, 997 (9th Cir. 2006).

Whether laches applies depends on the particular facts and circumstances of each case. *Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F. 3d 846, 862 (9th Cir. 2003). To establish laches, a party must demonstrate "(1) that the opposing party lacked diligence in pursuing its claim; and (2) that prejudice resulted from that lack of diligence." *Neighbors of Cuddy Mountain v. Forest Service*, 137 F.3d 1372, 1381 (9th Cir. 1998) (citation omitted). *See Ocean Advocates*, 402 F.3d at 862.

Even a lengthy, unexcused delay that does not result in prejudice is not a sufficient basis for laches to apply. *See Grand Canyon Trust v. Tucson Electric Power Co*., 391 F.3d 979, 988 (9th Cir. 2004). "Difficulties caused by the pendency of a lawsuit, and not by delay in bringing the suit do not constitute prejudice within the meaning of the laches doctrine." *Shouse v. Pierce Cnty*., 559 F.2d 1142, 1147 (9th Cir. 1977) (*per curiam*). *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006).

There is limited discussion of laches in a civil rights context, because the courts tend to rely on the statute of limitations to govern whether a plaintiff has "sat on their rights". Under the APA, the statute of limitations for challenging an agency action is six years and begins when the specific plaintiff has been injured. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2441 (2024). In a civil rights case, the laches doctrine only bars an action before the statute of limitations if the delay caused the other party to alter his position or be injured by the delay. *Brawley v. Washington*, 712 F. Supp. 2d 1208, 1217 (W.D. Wash. 2010).

20      PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
        INJUNCTION/TRO

In the instant case, the defendant has failed to demonstrate that the plaintiff's thirty-nine day "delay" caused GSA to alter its position or be injured by the delay. The defendant chose to pay for the fence on its own volition, without a public notice and comment process, and cannot cite the expenditure as an injury emanating from the plaintiff's delay. Further, repairs, renovations, and resuming normal business activities most likely would have occurred regardless of the plaintiff's filing suit.

This Court has previously rejected using laches to bar a preliminary injunction request for an as-applied constitutional challenge. *People Not Politicians Oregon v. Clarno*, 472 F. Supp. 3d 890, 899 (D. Or. 2020). In that case, this Court found that laches did not apply, due to the time needed to gather proof to substantiate an as-applied constitutional challenge. *Id.* Similarly in the instant case, the thirty-nine days were needed to adequately prove the ongoing harm caused by the Free Speech Plaza fence and research the available causes of action.

The fence was erected overnight, in less than 48 hours. It would have been infeasible for plaintiffs to rush to the courthouse before the fence was erected. As the weather becomes more favorable for outdoor activities, the likelihood of outdoor public gatherings increases. The government can show no harm from the timing. The fence went up literally overnight, and filing the lawsuit the day after it was erected as opposed to a few weeks after makes no difference in that factor. A laches defense is not warranted.

## CONCLUSION

Based upon this brief and plaintiffs' motion, exhibits, declarations, and testimony presented in court, plaintiffs respectfully request that the Court issue a preliminary injunction, requiring defendant to remove the fence blocking the upper area of the plaza

21    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION/TRO

at the Eugene federal building.

Respectfully submitted June 22, 2026,

/s/ Marianne Dugan
Marianne Dugan, Oregon State Bar No. 932568
Lauren Regan, OSB # 970878
CIVIL LIBERTIES DEFENSE CENTER
1711 Willamette St., Ste 301 # 359
Eugene, OR 97401
(541) 687-9180
mdugan@cldc.org
lregan@cldc.org

On the brief – Law clerks Joanna Spouge and Sarah Henry

22     PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
       INJUNCTION/TRO