UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

NAPHTALI RENSHAW; SUSAN
BARNHART; TYRRAS WARREN;
MICHAEL CARRIGAN; CHRISTOPER
ROMP ALA; and CHARLES AREFORD,

       Plaintiffs,

    v.

GENERAL SERVICES ADMINISTRATION,

       Defendant.

Case No. 6:26-cv-01127-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

On the eve of our nation's 250th year of its birth, it is apropos that a case involving the violation of Plaintiffs' First Amendment right to speak freely is presented to this Court. Our nation's birth was conceived in the word. The Founders, in their wisdom, understood that a robust and dynamic young nation can only flourish when a multitude of opposing ideas can openly compete for the people's hearts and minds. Such a nation can gain wisdom and mature through those tidal forces only when the government itself is restricted from silencing those ideas. This case involves the effective elimination of a long-established public forum in which the people have spoken freely for 50 years. This case is a reminder that our government can be short-sighted when focusing on protecting certain immediate interests. In so doing, it loses sight of protecting that which will make this nation endure—our speech.

Page 1 — OPINION AND ORDER

Plaintiffs bring claims for declaratory and injunctive relief under the Administrative Procedure Act ("APA") against Defendant General Services Administration ("Defendant" or "GSA") related to the construction of a fence surrounding the Eugene Federal Building in Eugene, Oregon. Plaintiff moves for a preliminary injunction, ECF No. 4, which the Court granted on June 22, 2026, following an evidentiary hearing and oral argument. ECF No. 31. At that hearing, the Court delivered a detailed ruling from the bench and offered both parties an opportunity to ask questions for clarification. Nevertheless, this Opinion and Order memorializes the Court's written and formal reasoning for granting Plaintiff's Motion for Preliminary Injunction.

## BACKGROUND

Plaintiffs are citizens who regularly participate in protests at the plaza located at the Eugene Federal Building ("the Plaza"). Compl. ¶¶ 12, 16, 22, 23, 26, 27, ECF No. 1. On April 30, 2026, Defendant constructed a fence around the perimeter of the Federal Building (the "Perimeter Fence") blocking access to the upper portion of the Plaza. A summary of the relevant facts follows.

### A.     Historical Use of the Plaza

Testimony from Plaintiffs and other witnesses, as well as GSA's own prior statements, undisputably establishes a long-standing, deep tradition of speech and protest activity at the Plaza.

Former Oregon State Senator and Lane County Commissioner Charles Peter Sorenson was living in Eugene when the Federal Building was constructed and worked in the building in 1975, shortly after it opened. Sorenson Decl. ¶¶ 4, 6, ECF No. 23. While working as a legislative assistant for U.S. Representative James H. Weaver in 1975, Mr. Sorenson observed "numerous protests," during which the protestors used the lawns, benches, and paved areas. *Id.* ¶ 4. Mr.

Sorenson also testified that protests could be audible to employees, even during work hours. From 1982 to 1994, while working as an attorney and visiting the Federal Building to attend to court matters, Mr. Sorenson observed protests against Congress, the IRS, the U.S. Forest Service, and the federal court. *Id.* ¶ 5. Mr. Sorenson also participated in protests, using the benches and lawn in the Plaza. *Id.* Between 1993 and 2021, when Mr. Sorenson served as Oregon State Senator and Lane County Commissioner, he spoke at "numerous protests" at the Plaza. *Id.* ¶ 6. Mr. Sorenson's testimony before this Court makes clear that protestors used both the lower and upper portions of the Plaza, with the upper part having a unique functional importance because of its size, use for press conferences and speeches, and access to benches and other seating. He also noted that he witnessed many large protests at the Plaza, attended by hundreds and even thousands of people, sometimes surrounding the Federal Building.

Plaintiffs also testified regarding the historical use of the Plaza. Plaintiff Michael Carrigan has lived and protested in Eugene since the early 1970s, and has "organized and attended countless rallies and protests" at the Plaza since the 1970s. Carrigan Decl. ¶¶ 2, 4, ECF No. 9. Mr. Carrigan testified that, during the 1970s, the Plaza was "center stage for hundreds of anti-war protests," and since then, it has been the site of protests for numerous causes. *Id.* ¶ 4. He testified that "[i]ts large size, central location, seat of the federal government in Eugene, visibility to traffic on three sides, and the fact that it is Eugene's primary traditional public forum have made it one of the most used locations for rallies and protests throughout the years." *Id.*

Plaintiff Susan Barnhart has been a local community member and activist since the 1980s. Am. Barnhart Decl. ¶ 2, ECF No. 17. She attended protests at the Plaza "on a regular basis for decades," using "all areas" of the Plaza. *Id.* ¶ 4. She testified that she and other elders in the community use the benches in the Plaza to "sit and participate" in protest events. *Id.* ¶ 7.

Page 3 — OPINION AND ORDER

Likewise, Plaintiff Charles Areford has used the Plaza "for numerous protests and rallies" since arriving in Eugene in 1989. Areford Decl. ¶ 6, ECF No. 11. Mr. Areford recalled one "very large protest in Feb[ruary] 1991 that featured a large die-in with several props in the central plaza of the Federal building." *Id.* More than sixty people, including Mr. Areford, were arrested at that protest. *Id.* Mr. Areford recalls that protestors continued to gather at the Federal Building "for weeks" afterward, and that the protests involved "confrontations with often provocative, threatening and violent protestors." *Id.*

Significantly, in April 2014, Defendant GSA's website contained the following statement regarding the Plaza:

> The Eugene Federal Building and Courthouse played a significant civil role in the early 1970s and during the Vietnam War. The plaza was and remains a favored venue as a stage for protests against the government's policies. There is demonstration activity weekly. Large demonstrations occurred in the spring of 2003, over the U.S. invasion of Iraq, in 1991, with a demonstration against the U.S. invasion of Kuwait and in 1992, due to the Rodney King beating. Most of the demonstrations are peaceful and without violence or arrests. The plaza has become a community focal point for citizen gatherings of many types. The courtyard was designed for people to congregate and be part of outdoor events and venues. The courtyard design was not intended for political demonstrations, but it has gained cultural and political significance due to these activities.

Third Dugan Decl. at 1-2, ECF No. 30. That statement no longer appears on GSA's website. *Id.* The record in this case has yet to provide any satisfactory explanation as to when GSA erased this historical content from its website, and why it did so. The answers to these questions may help this Court in determining whether Defendant spoliated evidence.

## B.      Recent Activity at the Plaza

Consistent with its historical use, Plaintiffs and other protestors have regularly used the Plaza as a site for protests throughout 2025 and 2026, noting that U.S. Immigration and Customs Enforcement ("ICE") and other federal agencies are located there, and that the site has "long been a traditional location for assembly and protest." Areford Decl. ¶ 3; Carrigan Decl. ¶ 3;

Page 4 — OPINION AND ORDER

Rompala Decl. ¶ 3, ECF No. 10; Am. Renshaw Decl. ¶ 4, ECF No. 18; Am. Barnhart Decl. ¶ 3; Dragovich Decl. ¶ 3, ECF No. 21; Hazelton Decl. ¶ 3, ECF No. 27. For example, in January 2026, following ICE's killing of nurse Alex Pretti in Minneapolis, Minnesota, Plaintiff Rompala participated in a candlelight vigil in the "upper plaza area," during which Plaintiff Rompala and many other local nurses grieved together, "participat[ing] in speeches, songs, and other expression." Rompala Decl. ¶ 4. Hundreds of community members attended this event. *Id.*

Similarly, Plaintiff Renshaw organizes an interfaith group called "Singing for Our Lives," which has been holding vigils and protests every Tuesday since September 2, 2025. Am. Renshaw Decl. ¶ 5. As Singing for Our Lives events have grown, the event has moved further into the Plaza to accommodate the number of attendees. *Id.* ¶ 6. Plaintiff Barnhart, who is part of a local group called "Planet vs. Pentagon," regularly protests "the many harms of war" at the Plaza. Am. Barnhart Decl. ¶ 5. Some protests are planned, while others are "spontaneous in response to an event." *Id.*

While there have been peaceful protests daily since June 2025, Federal Protective Services Area Commander William Turner noted that "there have been several instances of violent activists engaging in menacing behavior such as breaking windows, harassing the public and employees, and making threats at people entering the [Eugene Federal Building]." Turner Decl. ¶¶ 2, 7, ECF No. 26. The first incident Commander Turner noted occurred on September 23, 2025, during which a group of protesters "banged on windows in an attempt to forcefully enter the building and tampered with the gate card reader and Airphone Intercom system." *Id.* ¶ 7. Three individuals were cited, one of whom was arrested for throwing a 4-foot metal sign at officers. *Id.* There have also been "several incidents" during which activists "harassed the public, including veterans, by photographing and filming them, questioning them about their presence at

the building, and using bullhorns and yelling." *Id.* The Veterans Health Administration ("VHA") complained to GSA that veteran services were affected, as the conduct triggered Post Traumatic Stress Disorder symptoms for at least one veteran. *Id.*

Most significantly, on January 30, 2026, a protest occurred at the Plaza, during which a group of approximately 400 people gathered. *Id.* ¶ 9. A large group of protesters began "banging on the glass windows" and eventually breached the lobby of the Federal Building after shattering multiple windows. *Id.* at ¶¶ 9-10. The building had to be evacuated for safety. Anderson Decl. ¶ 10, ECF No. 25. Mr. Anderson, the Building Manager for the Public Building Service (a division of Defendant GSA) for the Eugene Federal Building, sheltered inside the building after its evacuation. *Id.* ¶¶ 1, 10-13. Federal Protective Services deployed munitions to move protestors away from the building, and the Eugene Police Department ultimately arrived, declared a riot, and assisted Federal Protective Services in moving protestors off the property. *Id.* ¶ 12. As a result of the January 30, 2026 riot, many windows were broken, and there was graffiti and trash throughout the Plaza. *Id.* ¶¶ 14-18. Some of the graffiti contained "vulgar and hateful language." *Id.* ¶ 18.

On February 2, 2026, an additional window was broken when a rock was thrown through a second-floor window. Anderson Decl. ¶ 19. That is the only window that has been broken since the riot.

### C.    Fence Design and Construction

In mid-January 2026, in response to the VHA's concerns about protestors' interactions with veterans, the Facility Security Committee ("FSC") for the Eugene Federal Building discussed whether to obtain and install a fence "to deter aggressive protestors from interfering with agency missions, accessing the courtyard, and disrupting Facility operations." Anderson Decl. ¶ 4. Following a January 21, 2026, VHA meeting with "senior agency leadership" and Mr.

Anderson regarding veteran encounters with protestors, VHA determined it could not continue operating at the Eugene Federal Building and decided to vacate the building. Anderson Decl. ¶¶ 5-6. By January 23, 2026, a week before the riot, the FSC voted to approve installation of a security fence and directed GSA to acquire one. *Id.* ¶ 7. Mr. Anderson testified that VHA and the Veterans Benefits Association—both of which were located in the annex of the Federal Building—vacated the annex in late March or early April, before Defendant installed the fence.

On April 28, 2026, Defendant began preparing to install the fence, and the Perimeter Fence was fully installed on April 30, 2026. The perimeter of the fence is pictured below in bright red, with padlocked pedestrian gates outlined in blue.



Turner Decl. ¶ 11.

Mr. Anderson testified during the preliminary injunction hearing that Federal Protection Services recommended the Perimeter Fence, that he was unaware of whether any other fencing options were proposed, and that there were no discussions about alternatives when the Perimeter Fencing was proposed. The Perimeter Fence layout was designed to protect the facility, to protect its occupants and visitors, to allow a setback for ongoing repairs to damage caused during the riot, and to allow contractors to complete a hardening project on the lobby and exterior doors of the facility. Mr. Anderson further testified that, in light of the topography at the site, the current fence layout was the easiest and fastest way to get the fence up. During discussions about fence design, a lower portion of the Plaza was intentionally left accessible to accommodate free speech activities. Material and installation costs for the fence were approximately $270,000.

Mr. Anderson testified, and this Court observed during a site visit conducted on June 18, 2026, that each of the three pedestrian gates is padlocked. There are no crashbars or emergency release mechanisms from either the inside or outside of these gates that would allow someone to open these gates in an emergency without having a key. Not all employees have keys. Once inside the fence, the only ways out are through the front entrance of the Federal Building or by unlocking the keyed padlock on one of the three pedestrian gates.

Emails between Mr. Anderson and City of Eugene officials, as well as Mr. Anderson's testimony during the hearing, establish that the Perimeter Fence is intended to be temporary, yet will remain for approximately two years. Dugan Decl. Ex. D at 1, ECF No. 5-4.

Mr. Anderson also testified that members of the public may seek "Use of Space Permits" to access the fenced off portion of the Plaza. Mr. Anderson testified that, in his experience, turnaround for decisions on applications for Use of Space Permits is around 72 hours, and that there is a ten-day limit on response time. Permits must be approved by a national Public Building

Service commissioner in Washington, D.C. Historically, Use of Space Permits were sought by members of the public to provide a courtesy to security, or as a right of first refusal. Mr. Anderson could recall a couple dozen permit applications being received for use of Federal Building space in his 17 years with GSA. To Mr. Anderson's knowledge, nobody has ever been cited for using any space at the Federal Building without a Use of Space Permit. All Plaintiffs' witnesses testified they were never aware they were required to have a permit to assemble, nor did any government agent ever tell them they would be in violation of any law for not having an approved Use of Space Permit.

### D.    Use of the Plaza Following Fence Construction

An individual with architectural design experience, retained by Plaintiffs' counsel, estimated that the fence blocked off approximately 44,930 square feet of the total 50,570 square feet of the Plaza. Henry Decl. ¶ 4, ECF No. 22. The portion of the Plaza that remains open to the public following the fence's construction is pictured below.



Turner Decl. ¶ 14. The remaining available protest area is approximately 5,640 square feet and can accommodate a maximum of approximately 250 people. Henry Decl. ¶ 4, Turner Decl. ¶ 6. The space has been too small to accommodate protest events that have taken place since the

fence was erected. Warren Decl. ¶ 7, ECF No. 8; Am. Renshaw Decl. ¶ 7. The available area also has limited access to shade and no benches. Am. Renshaw Decl. ¶ 7; Am. Barnhart Decl. ¶ 7; Carrigan Decl. ¶ 7. The available area is close to the street, and Plaintiff Renshaw testified to regularly experiencing "coal-rolling," in which drivers blow exhaust at the crowd. Plaintiff Renshaw also testified that individuals at Singing for Our Lives events have experienced aggression from members of the public for spilling into the sidewalk because of the size of crowd attending the events, and especially when some members seek shade under the trees near the sidewalk. There has been at least one incident where a vehicle lost control and hopped the curb near the crowd. Finally, Plaintiff Renshaw testified that the nearby traffic disrupts vigils, and that the upper portion of the Plaza is better suited for grieving because it is both quieter and in closer proximity to the building Plaintiff Renshaw described as symbolizing the cause of the violence for which the vigils are held.

### E.    Procedural History of this Litigation

Plaintiffs filed this lawsuit on June 4, 2026, and filed a Motion for Preliminary Injunction and Temporary Restraining Order on June 8, 2026. The Court reviewed Plaintiffs' motion on the day it was filed and, noting that Plaintiffs had not satisfied the requirements for issuing a temporary restraining order without notice to the adverse party under Rule 65(b)(1), denied that portion of the motion. ECF No. 12. The Court also ordered an expedited briefing schedule on the Motion for Preliminary Injunction and set the matter for an evidentiary hearing and oral argument on June 18, 2026. *Id.*

During the evidentiary hearing, the Court heard evidence from Plaintiffs' witnesses and—at the Court's direction—Mr. Anderson. The Court also conducted a site visit to the Plaza to provide context for the photographs and descriptions in the Court record. The hearing continued on June 22, 2026, and, at the conclusion of oral argument, the Court explained in

Page 10 — OPINION AND ORDER

detail and on the record that it found that Plaintiff had satisfied the standard for a preliminary injunction, granted the motion, and ordered that Defendant return the Federal Building to the status quo by removing the Perimeter Fence within 48 hours, which was roughly how long it took to construct the fence. This written opinion memorializes the Court's reasoning for granting Plaintiff's Motion for Preliminary Injunction on June 22, 2026.

On June 24, 2026, Defendant moved for an extension of time in which to comply with the Court's order to remove the fencing in 48 hours. ECF No. 33. After convening a hearing on the motion, and after considering the substantial steps Defendant had taken to comply with the order, the Court extended the deadline to comply to July 2, 2026. ECF No. 38. The Court declined to extend the deadline to Defendant's requested date of July 5, 2026.  The Court noted that July 5 falls on the Sunday of Independence Day weekend. Defendant failed to demonstrate that any work could have been performed on that day. Nor did it explain that it would schedule work on July 4 or even July 3 on which many federal agencies would not be open for business. The latest possible date on which the fence could be removed was July 2, and Defendant's representations also confirmed to this Court that Defendant could arrange a contractor and the necessary permits to perform the work.

## STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the

mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfu*s, 697 F.3d 706, 725 (9th Cir. 2012).

When a plaintiff seeks "mandatory" relief rather than "prohibitory" relief, that relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1979) (citation omitted).

## DISCUSSION

Plaintiffs contend that they satisfy the *Winter* test and that the Court should order Defendant to restore the status quo.

## I.      Likelihood of Success on the Merits

For purposes of a preliminary injunction, a plaintiff "only needs to show the requisite combination of probable success on the merits and the possibility of irreparable injury with respect to any one of [their] claims." *Fin. Express LLC v. Nowcom Corp.*, 564 F. Supp. 2d 1160, 1168 (C.D. Cal. 2008). Here, Plaintiffs argue that they are likely to succeed on each of their four claims for relief. For the following reasons, the Court finds that Plaintiffs have established a

likelihood of success on the merits of Count II of their Complaint and therefore does not address the likelihood of success on Plaintiffs' remaining counts.

Count II of Plaintiffs' Complaint alleges that Defendant violated the APA because its construction of the Perimeter Fence violates the First Amendment. Under the APA, the Court must hold unlawful and set aside agency actions found to be "contrary to constitutional right." 5 U.S.C. § 706(2)(B). The Constitutional right at issue here is Plaintiffs' right to free speech under the First Amendment. The Ninth Circuit has "articulated a unique likelihood-of-success standard in First Amendment cases: '[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech.'" *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022)).

The parties do not dispute that Plaintiffs' speech at issue is protected under the First Amendment. The Court therefore examines the nature of the forum and whether the restriction on Plaintiffs' speech satisfies the requisite standard for the relevant forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

### A.    Traditional Public Forum

A traditional public forum is one which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). While Defendant conceded in its briefing and at oral argument that the upper portion of the Plaza is a traditional public forum for purposes of this motion, it made clear that reserved the right to contest that issue later in the case.

Regardless of Defendant's position, for purposes of the Motion for Preliminary Injunction, the Court independently finds substantial and clearly compelling evidence that the entire Plaza (within and without the Perimeter Fencing) is a traditional public forum. Many witnesses consistently and cogently testified about using the entire Plaza for protests and demonstrations, dating back to the building's opening in 1975. Further, even though GSA has erased its record of the fact, GSA's own website prior to this litigation acknowledged the historical use and importance of the entire Plaza for free speech activity. The record also makes clear that there have historically been large rallies and assemblies at the Plaza in excess of the number of people who can safely assemble in the lower portion of the Plaza left outside of the fence. The Court finds that the entire Plaza, including the upper portion of it that is now closed off by the Perimeter Fence, is a traditional public forum. *See also Occupy Eugene v. U.S. Gen. Servs. Admin.*, 43 F. Supp. 3d 1143, 1152 (D. Or. 2014) ("Considering the long history of both protests and other gatherings at the federal plaza, as evinced by the record, the Plaza undoubtedly qualifies as this type of forum").

In a traditional public forum, the government may regulate the "time, place, and manner" of speech so long as the restriction meets three requirements: (1) it must be "justified without reference to the content of the regulated speech," (2) it must be "narrowly tailored to serve a significant governmental interest," and (3) it must "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). There is no dispute here that the construction of the fence is content neutral, leaving only the latter two elements at issue. The Court addresses each in turn.

### B.    Narrow Tailoring

A government's restriction on the time, place, and manner of speech must be "narrowly tailored to serve a significant government interest." *Id.* A restriction is "narrowly tailored" if it

Page 14 — OPINION AND ORDER

"targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). "[T]he stated interest must be served less effectively absent the regulation, and the regulation may not burden substantially more speech than is necessary to further the regulating authority's legitimate interests." *United Bhd. of Carpenters & Joiners of Am. Loc. 586 v. N.L.R.B.*, 540 F.3d 957, 968 (9th Cir. 2008) (internal quotations, alteration, and citation omitted). Applying that analysis here, the Court first looks to Defendant's stated interests in constructing the Perimeter Fence and then determines whether the scope of the restriction is narrowly tailored to that interest.

There is no dispute here that Defendant's stated interests are significant. Discussions around construction of the Perimeter Fence were precipitated by confrontations between protestors and veterans visiting the VHA, triggering trauma responses and prompting concern that protest activity might adversely affect veterans' access to services. Defendant's stated interests in constructing the Perimeter Fence were to protect the building, its employees, and its visitors, and to allow for repairs and hardening of the lobby and exterior doors following the January 30, 2026 riot. Protection of property and public safety are well-established government interests. *See McCullen v. Coakley*, 573 U.S. 464, 486-87 (2014) (acknowledging the legitimacy of the government's interests in "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting [access to services]").

But while Defendant's stated interests here are significant, the Court finds that the Perimeter Fence was not narrowly tailored to serve those purposes. With its inadequate solution, GSA has in turn created significant safety concerns for the public assembling outside the perimeter fencing on the street corner, and anyone, including building occupants, who would not be able to easily exit from inside the padlocked perimeter fencing in case of an emergency. The

Page 15 — OPINION AND ORDER

placement of the Perimeter Fence wholly excludes the public from using the upper portion of the Plaza, which the record establishes has been historically used as an important site of free speech activity dating back to the 1970s. Examining each of Defendant's stated interests in the context of the Perimeter Fence, it is clear that the fence results in a severe restriction on speech, not tailored to serve the interests at issue.

To the extent the Perimeter Fence was erected to prevent harassment of veterans seeking services, the VHA and VBA vacated the Federal Building annex before the fence was constructed. The record is silent on when, or even whether, either agency might return. Thus, while protection of veterans is a significant interest, that interest is not served at all by the Perimeter Fence given that the annex is now vacant.

To the extent the Perimeter Fence was erected in response to the January 30, 2026 riot,[1] it is a vast overreach. The Ninth Circuit has held that "the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter)." *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996). That is particularly true here, where the record reflects that following the riot, and in the absence of any perimeter fencing in place, peaceful protests regularly continued without significant incident. Beyond a single incident of a rock thrown through a window—which the Court notes could still occur with the fence in its current configuration—no similar instances of violence occurred in the three months that elapsed between the time the riot occurred on January 30, 2026, and when the Perimeter Fence was

---

[1] The Court is also skeptical of this rationale, as the FSC voted to approve the Perimeter Fence before the riot ever occurred.

completed on April 30, 2026. A single night of violence here does not justify entirely closing off a traditional public forum with a long and rich history as a free speech plaza.

To the extent the Perimeter Fence was erected to allow for repairs and hardening upgrades to the Federal Building, the record does not support that the Perimeter Fence is narrowly tailored to that interest, either. When asked during the evidentiary hearing about what setback from the building was necessary for the project, Mr. Anderson responded that the Perimeter Fence was designed in the easiest and fastest way based on the topography of the site, rather than based on any specific needs to repair or upgrade portions of the building. Moreover, Defendant has not awarded a contract or approved a final project schedule, and Mr. Anderson testified to a long lead time for the hardening project. Thus, construction of the perimeter fencing for that purpose is premature and not properly tailored to any specific needs of the as-yet approved hardening project.

Defendant also contends that the Perimeter Fence is a narrowly tailored restriction on Plaintiffs' First Amendment rights because Plaintiffs retain the ability to access the upper portion of the Plaza if they seek a Use of Space Permit. The permitting scheme is insufficient for several reasons. First, the record makes clear that Use of Space Permits have never been required to use the Plaza, as they were described as a courtesy to security and have never been enforced as a required pre-requisite to assembly. To the extent that the Perimeter Fence makes Use of Space Permits a de facto requirement (because without one Plaintiffs have no access to the upper Plaza), the government has not demonstrated that the permitting scheme is justified as it must under *Meineke*. A permitting scheme does not pass Constitutional muster where it delegates "overly broad licensing discretion to a government official." *Cuviello v. City of Vallejo*, 944 F.3d 816, 827 (9th Cir. 2019). Here, where Defendant has articulated no standards by which it decides

whether to grant a permit to use the Plaza, the permit scheme is not Constitutional. *See, e.g.*, *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) (City ordinance was "constitutionally objectionable on its face" where it "grant[ed] officials unfettered discretion to restrict speech").

The permitting scheme is also insufficiently narrowly tailored because it does not allow for "pop-up protests," meaning protests that are immediately responsive to current events. Mr. Anderson testified that the typical time for approval of Use of Space Permits was 72 hours.[2] But "[T]iming is of the essence in politics. . . . [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all . . . A delay of even a day or two may be intolerable when applied to political speech in which the element of timeliness may be important." *Id.* at 1356 (first and second omission in original). Here, the record before the Court illustrates a long history of the Plaza's use as a space for spontaneous protests in response to current events. Defendant's permitting scheme is not narrowly tailored because it wholly forecloses the use of the Plaza for timely protests.

Finally, the permitting scheme is not narrowly tailored because access to a fenced-in Plaza is not the same as access to the open Plaza and poses significant safety concerns. Methods of ingress and egress are severely restricted by the Perimeter Fence, which contains padlocked gates. Even if those would be unlocked in the event a Use of Space Permit were granted for use of the upper Plaza—which is unclear from the record—dispersal and safe exit in the event of an

---

[2] The record is also unclear whether that 72-hour standard remains the case, as it was based on Mr. Anderson's recollection of the historical timeline for granting Use of Space Permits. But Mr. Anderson also testified that, since March 2025, the process for approving Use of Space Permits has changed, now requiring national approval. It is therefore unclear whether applicants can still expect decisions on their permit applications within the 72-hour timeline Mr. Anderson testified to.

emergency would be severely restricted. Given the history of large protests using the upper Plaza, the permitting scheme is not narrowly tailored because it is unsafe.

In sum, while Defendant has a significant interest in protecting the building, its occupants, and the public, closing off the upper Plaza—a historically important traditional public forum in the City of Eugene—is not narrowly tailored to those interests.

## C.    Alternative Channels

To pass constitutional muster under the First Amendment, a time, place, and manner restriction on speech must also "leave open ample alternative channels for communication of the message." *Ward*, 491 U.S. at 791.  Defendant contends that the Perimeter Fence leaves open ample alternative channels of communication because Plaintiffs retain access to the lower portion of the Plaza.

The First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). However, alternative channels are not adequate if the speaker is not able to reach their intended audience, if the location is part of the expressive message, if the alternative does not consider the opportunity for spontaneity, or if they are overly costly or inconvenient. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 (9th Cir. 2009). Here, the Court finds that the lower Plaza is an inadequate alternative for several reasons.

First, use of the lower Plaza poses safety concerns not posed by the upper Plaza. The Court heard testimony that protestors have been subjected to "coal-rolling" by vehicles passing by in close proximity to the lower Plaza and aggression by pedestrians using the nearby sidewalk. "Coal-rolling" is not a mere annoyance. Members of the public, and especially the elderly, can be seriously harmed by exposure to these noxious fumes.

Page 19 — OPINION AND ORDER

Second, testimony also revealed that erratic driving poses a danger to those assembled on the lower Plaza. Compounding the safety issues, the record makes clear that the available space is too small to accommodate the protests that have historically taken place there. Indeed, Plaintiffs testified that, since the fence was constructed, events have been too large to be accommodated by space available in the lower Plaza. People who assemble on that corner are boxed in between the outside of the perimeter fence and the two streets with substantial traffic. This, too, poses a substantial risk of harm in the event a large number of people try to move away from this street corner quickly.

Third, the available space does not adequately accommodate the elderly and people with disabilities, as it lacks benches and adequate shade.

Finally, the lower Plaza is inconsistent with some of the messages Plaintiffs wish to convey and the types of protest they have engaged in. The upper Plaza has historically been used for memorials and vigils, where the relative quiet afforded by distance from the street and the proximity to the causal source of Plaintiffs' grief are both important to the type of protest activity at issue. The lower Plaza is not an adequate alternative. Defendant's Perimeter Fence does not offer Plaintiffs satisfactory alternatives.

Plaintiffs have established more than a likelihood of success on the merits of their claim that Defendant's decision to construct the Perimeter Fence is contrary to Plaintiffs' First Amendment rights and in violation of the APA. Indeed, on the record before the court, there is no serious doubt that the Perimeter Fence is an unlawful time, place, and manner restriction on Plaintiffs' rights to freely protest at a site of historical significance for political demonstration in the City of Eugene. Plaintiffs satisfy the first *Winter* factor.

## II.    Irreparable Harm

To meet the second *Winter* factor, Plaintiffs must demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." 555 U.S. at 20. Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The Ninth Circuit and the Supreme Court "have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009). Thus, "[a] colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (citation omitted).

Given Plaintiffs' likelihood of success on the merits here, they have also established a likelihood of irreparable harm. That is particularly true now, when our nation is set to celebrate the 250th year of independence. The effective elimination of this free speech plaza, a long-standing traditional public forum, on the eve of honoring our independence is a clear irreparable harm to Plaintiffs and every member of the public who speak freely on this July 4. To restrict speech in this way is un-American. To allow the Plaza to remain closed to public demonstrations on that day, as it would be in the absence of a preliminary injunction, would irreparably harm Plaintiffs' First Amendment rights. *See, e.g.*, *Klein*, 584 F.3d at 1208 ("The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and a delay of even a day or two may be intolerable . . .") (quotations, alterations, and citations omitted).

## III.    Balance of Equities and Public Interest

Finally, where the government opposes a preliminary injunction, the last two factors in the preliminary injunction analysis merge, because any harm to the public interest impacts the

balance of the equities. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs contend that these factors weigh in their favor because their and the public's interest in their First Amendment rights outweighs the Defendant's interest in continuing its unlawful action. Defendant relies on the same significant interests as it did on the merits, arguing they outweigh Plaintiffs' harm, particularly because Plaintiffs waited thirty-nine days to seek a preliminary injunction after the fence was constructed.

In light of the Court's finding that Plaintiffs are likely to succeed on the merits of their claims that the construction of the Perimeter Fence violates the First Amendment, the Court finds that the final two *Winter* factors weigh strongly in favor of injunctive relief. *See Am. Beverage Ass'n*, 916 F.3d at 758 (noting that when plaintiffs have a colorable first amendment claim, the balance and hardships and public interest weigh in their favor); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (concluding that when the government's alleged action violates federal law, the combined balance of equities and public interest generally weighs in favor of the plaintiff). Defendant offers no authority[3] for the proposition that Plaintiffs' delay in filing a preliminary injunction motion weighs against Plaintiffs here, nor any reasonable explanation why the delay results in prejudice to Defendant, who has benefited from the fence during the time Plaintiffs allegedly "rested on their rights." Def.'s Resp. 21. The Court does not find that

---

[3] Defendant does cite one case from the District of Idaho for the proposition that a finding of likelihood of success on the merits of a First Amendment claim does not "automatically" mean that the final two *Winter* factors favor a plaintiff seeking a preliminary injunction. Def.'s Resp. at 20 (citing *Tyler v. Coeur d'Alene Sch. Dist. #271*, 568 F. Supp. 3d 1071 (D. Idaho 2021)). The Court has generally declined in this Opinion to address Defendant's repeated citations to district court opinions throughout its Response because those opinions are neither binding nor persuasive given their significant factual dissimilarities from this case. However, *Tyler* warrants a mention here because it simply does not stand for the proposition for which Defendant cites it. Not only is *Tyler* factually dissimilar as it involves a limited public forum, it also explicitly found that Plaintiffs had not established either a likelihood of success on the merits, or serious questions going to the merits. 568 F. Supp. 3d at 1082.

thirty-nine days is an unreasonable amount of time for Plaintiffs to locate counsel, craft legal theories and causes of action, and file a lawsuit and preliminary injunction motion. Even if the Court were to weigh that delay against Plaintiffs in its consideration of the equities, it still finds that the balance tips sharply in Plaintiffs' favor given the lack of evidence of prejudice to Defendant and Plaintiffs' strong showing on the merits. The final two *Winter* factors tip sharply in Plaintiffs' favor.

Plaintiffs have met the requirements for a preliminary injunction under *Winter*. Plaintiffs' Motion for Preliminary Injunction is granted.

## IV.    Remedy

Plaintiffs seek an injunction requiring Defendant to restore the status quo by removing the Perimeter Fence. Defendant contests Plaintiffs' entitlement to injunctive relief and characterizes that relief as "affirmative" as opposed to "prohibitory" for purposes of arguing Plaintiffs should be subject to a heightened standard,[4] but provides no argument that the relief sought is overbroad.

The Court finds removing the Perimeter Fence is appropriately tailored to address the harm to Plaintiffs' First Amendment rights. Seemingly lesser measures pose problems. For example, merely directing Defendant to open the pedestrian gates is insufficient for the safety

---

[4] While the Court finds that Plaintiffs have satisfied the *Winter* test however the relief is characterized, it notes that restoration to the status quo is unambiguously prohibitory relief because it was Defendant's action of constructing the fence that altered the status quo. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) ("Because it was the [Defendant's] action that 'affirmatively changed' th[e] status quo and Plaintiffs' motion for a preliminary injunction seeks to restore that status quo, the relief sought is properly viewed as a prohibitory injunction.")

reasons addressed above, and the record makes clear that ordering a reconfiguration of the fence would take more time than Plaintiffs' First Amendment rights should be made to wait.[5]

## CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Preliminary Injunction (ECF No. 4) was granted on June 22, 2026, and Defendant was ordered to restore the status quo by removing the Perimeter Fence.

DATED this <u>26th</u> day of June 2026.

_____
MUSTAFA T. KASUBHAI (he/him)
United States District Judge

---

[5] During oral argument, the Court invited discussion as to how to reconfigure the fence to accommodate access to the Plaza while still protecting the building, its employees, and its visitors. The Court proposed a configuration that it suggested would be appropriate to protect the government interests while providing access to the Plaza. However, Defendant could not provide a timeline for when the fence would be able to be moved. Mr. Anderson testified that a contract would need to be awarded and that, in the case of the initial fence placement, the contract was awarded approximately a month and a half or two months prior to the work being done. The Court concluded that the remedy was more appropriately focused on restoration of the status quo and declined to affirmatively order that the fence be moved. Thus, while Defendant is authorized to construct a fence in the manner the Court outlined at oral argument, Defendant was not ordered to do so.